**William B. PRYOR, Plaintiff,**

v.

**UNITED STATES STEEL CORPORATION, et al., Defendants.**

**No. 82 Civ. 216 (MJL).**

United States District Court,
S.D. New York.

July 2, 1984.

---

**26.** 10 U.S.C. §§ 7420–7438 (1982).

**27.** 42 U.S.C. § 6508 (1982).

**28.** 40 Op.Att'y Gen. 41 (1941).

Schwartz, Klink & Schreiber, P.C., New York City, for plaintiff.

Breed, Abbott & Morgan, New York City, for defendant U.S. Steel Corp.

Moses & Singer, New York City, for defendant Bankers Trust Co.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

This is an action brought on behalf of a class of shareholders of Marathon Oil Co. ["Marathon"],[1] under the Securities Exchange Act of 1934, and certain rules promulgated thereunder. Plaintiff seeks damages allegedly sustained during the takeover of Marathon by United States Steel

---

1. Plaintiff William Pryor brings this action "on behalf of himself and all other persons or entities similarly situated who owned, held, or were otherwise entitled to tender Common Shares of Marathon to defendants in accordance with the terms of the defendants' public Tender Offer on or before the Proration date and who duly tendered and perfected tender thereof on or before the Proration Date rather than afterwards."

Corp. ("U.S. Steel"),[2] in January, 1982, by way of a tender offer. In addition to his federal claims, plaintiff has several pendant state claims for breach of contract. This matter is now before us on defendant's motion to dismiss, brought pursuant to Rule 12(b)(6), Fed.R.Civ.P.

## FACTUAL BACKGROUND

The following facts are not in dispute. On November 19, 1981, defendants U.S. Steel and USS, Inc., made a tender offer to purchase 30,000,000 shares of Marathon common stock for $125.00 per share. The tender offer provided that in the event that more than 30,000,000 shares were tendered and not withdrawn, shares were to be purchased pro rata according to the number of shares tendered on or before the proration date.[3] The proration date was originally set as November 28, 1981, at 12:00 midnight, New York City time, thus establishing a ten day proration period. The tender offer was to expire on December 17, 1981, at 12:00 midnight, New York City time, unless extended. Subsequently, extensions of the original deadlines became necessary because of litigation brought by Mobil Corporation against defendants U.S. Steel and USS, Inc., which delayed implementation of the tender offer. Pursuant to a first Supplement to Offer, published on December 1, 1981, the proration date was extended to December 4, 1981, at 12:00 midnight, New York City time. Pursuant to an order of the Sixth Circuit Court of Appeals, dated December 23, 1981, and as set forth in a second Supplement to Offer, published on December 24, 1981, the expiration date was extended so that the tender offer would expire on January 6, 1982, at 12:00 midnight, New York City time.[4]

According to the tender offer, tender could be perfected either by delivery of the shares to BTC, or under prescribed circumstances, by transmittal of a guarantee of delivery to BTC, on or before the proration date, *and* delivery of the shares to BTC within eight business days after execution of the guarantee. This meant that the latest *possible* date by which shares would have to be delivered in order to be included in the proration pool, was December 16, 1981, at midnight.

However, since Marathon shareholders who had tendered could withdraw the shares up until the expiration date, January 6, 1982, the actual number of shares in the proration pool, and hence the proportion of each participant's tendered shares that would be bought for cash, did not become fixed until that date.

On December 8, 1981, defendants announced publicly that approximately 54 million shares had been tendered by the proration date. Following this initial announcement, two intermediate announcements

**2.** Defendants in this action include U.S. Steel, USS, Inc., an indirect wholly owned subsidiary of defendant U.S. Steel and Bankers Trust Company ["BTC"], a New York banking corporation.

**3.** The relevant provision of the tender offer provided as follows:

The manner in which the Purchaser [USS, Inc.] will purchase validly tendered Shares, upon the terms and subject to the conditions of the Offer, will depend upon whether the Offer is over-subscribed by Shares validly tendered at or prior to 12:00 Midnight, New York City time, on Saturday, November 28, 1981 (the "Proration Date"), and not withdrawn. Upon the terms and subject to the conditions of the Offer, if more than 30,000,000 Shares (or any greater number of Shares to be purchased pursuant to the Offer) shall be validly tendered on the Proration Date and not withdrawn, then Shares so tendered shall be purchased, as provided in Section 2, on a pro rata basis (adjusted to avoid the purchase of fractional Shares) according to the number of shares tendered on the Proration Date by each shareholder, and Shares tendered after the Proration Date will not be purchased.
Offer to Purchase 30,000,000 Common Shares— November 19, 1981, Sec. 1, pp. 2–3.

**4.** The Court of Appeals for the Sixth Circuit, by decision filed December 23, 1981, found that U.S. Steel and USS, Inc. had violated section 14(e) of the Securities Exchange Act by reason of certain unlawful "lock-up options" obtained in connection with the tender offer and the related merger agreement with Marathon. *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366, 374 (6th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982). U.S. Steel and USS, Inc. were enjoined from continuing with the tender offer unless these unlawful lock-up options were surrendered.

were made indicating that a lesser number of shares—"approximately 51 million"—had been "perfected ... within the required time period." [5]

The purchase by U.S. Steel of thirty million tendered shares took place shortly after midnight on January 7. In a press release dated January 8, 1982, U.S. Steel announced that 54,200,000 Marathon shares were held by the Depositary as of midnight January 6, 1982. Plaintiff's Exhibit G to Affidavit. Finally, in a press release dated January 11, 1982, U.S. Steel announced that "53,880,360 Marathon Co. shares have been accepted for proration." Plaintiff's Exhibit H to Affidavit.

On January 11, three business days after the purchase occurred, shareholders were paid $125 per share for 55.6% of the shares tendered.

Plaintiff alleges, and the Court must assume for the purposes of this motion, that defendants accepted for inclusion in the proration pool approximately three million shares of common stock, which had not been duly and validly tendered under the terms of the tender offer on or before the proration date of December 4, 1981. According to plaintiff, some of these shares were accepted for inclusion in the proration pool after December 16, 1981, the latest possible delivery date.

The acceptance of the late tendered shares reduced the pro rata percentage of plaintiff's shares that were purchased and paid for by defendants, from approximately 58.8% of plaintiff's tendered shares to approximately 55.6% of plaintiff's tendered shares (or a 3.2% difference). Plaintiff allegedly perfected tender on 1,500 Common Shares of Marathon prior to the proration deadline. Therefore, according to plaintiff, he was entitled to have 882 shares purchased, but defendants have accepted and paid for only 834 shares at the $125 price. Plaintiff claims that he has been damaged in an amount of approximately $50 per share not accepted because of the wrongful inclusion of the three million late tendered shares. In addition plaintiff claims, upon information and belief, that the persons and entities which constitute the class of shareholders on whose behalf this action is brought, perfected tender of approximately 51,000,000 common shares of Marathon in accordance with the terms of the tender offer prior to or on the proration deadline. Plaintiff estimates that the damages caused by the wrongful exclusion of 3.2% of the shares tendered by the class, amounted to approximately 83 million dollars together with interest from January 7, 1982.

In the alternative plaintiff alleges that if defendants did not accept shares perfected after the proration date and delivery date, they intentionally made false and misleading statements of material fact to the public (in both the December 17 press release and the December 24, Supplement to the Offer), in that defendants knew that a materially larger number of shares—approximately 54 million—were to be accepted for proration. Plaintiff further alleges that he and other members of the class reasonably relied on defendants' misrepresentations in calculating the number of shares that were to be returned to them unpurchased at the end of the waiting period, and acted on the basis of this information in their subsequent investment decisions. Knowing that the market price for the unpurchased and returned shares would be substantially lower than the cash price of $125 per share being paid under the tender offer, plaintiff and other class members allegedly attempted to reduce their losses by engaging in various hedging transactions, including

**5.** A press release issued on December 17, 1981 announced:

> Tenders of approximately 51 million shares of Marathon have been perfected under the offer by the delivery of stock certificates within the required time period.

Then in the Second Supplement Offer, published December 24, 1981, defendants stated:

3. Proration Date. The Proration Date of Friday, December 4, 1981 has not been changed. Tenders of approximately 51,000,-000 shares have been perfected under the Offer by the delivery of stock certificates within the required time period and, if such Shares are not withdrawn, Shares tendered after the Proration Date will not be purchased.

selling calls and/or buying puts, and engaging in option transactions and short sales. Plaintiff alleges that because of their reliance on defendants' misrepresentations, he and other class members suffered financial injury and losses in connection with their hedging transactions and with the eventual disposition or sale of unpurchased shares.

Plaintiff makes several claims for relief. He claims first that the defendants' acceptance of late-tendered shares for proration, violated Sections 10(b), 14(d)(6), and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(d)(6) and 78n(e) and the rules promulgated thereunder including Rule 10b–13, Rule 14d–6(d), and Rule 14d–6(e), C.F.R. §§ 240.10b–13, 240.14d–6(d), 240.14d–6(e), and the common law of contracts. *See* Plaintiff's Second Amended Complaint, First, Second and Sixth Claims For Relief. He further claims that by accepting late-tendered shares, defendants effectively extended the proration date, without public notice of such extension in violation of Section 14(e) of the Securities Exchange Act of 1934, and Rule 14e–1(d), C.F.R. § 240.14e–1(d). See Plaintiff's Third Claim for Relief.

Alternatively, plaintiff claims that defendants made false and misleading statements of material fact in violation of Sections 14(d) and 14(e) of the Securities Exchange Act and Rules 14d–6(d) and Rule 14d–6(e). See Plaintiff's Fourth Claim for Relief.

Finally, plaintiff claims that defendants' failure to pay promptly for the stock tendered by plaintiff and other members of the class, violated Section 14(e) of the Securities Exchange Act of 1934, and Rule 14e–1(c) promulgated pursuant thereto, and the common law of contracts. See Plaintiff's Fifth and Seventh Claims for Relief.

Defendants have moved to dismiss all of the plaintiff's claims. For the reasons set forth below, we find that defendants' motion should be granted in part and denied in part.

*Section 14(d)(6) Claim*

Plaintiff's first and primary claim arises under Section 14(d)(6) of the Williams Act, 15 U.S.C. § 78n(d)(6). Section 14(d)(6) provides in relevant part:

Where any person makes a tender offer, or request or invitation for tenders, for less than all the outstanding equity securities class, and where a greater number of securities is deposited pursuant thereto within ten days after copies of the offer or request or invitation are first published or sent or given to security holders than such person is bound or willing to take up and pay for, the securities taken up shall be taken up as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor.

Plaintiff argues that § 14(d)(6) imposes a mandatory proration deadline, and prohibits the acceptance of shares tendered after that deadline. He alleges that defendant violated this provision by including in the proration pool, approximately three million Marathon shares which were not validly tendered by the proration date or delivered by the delivery date.

Defendants move to dismiss this claim on two grounds. First, they argue that this Court should not imply a right of action on behalf of plaintiff under § 14(d)(6) absent any indication, either in the language or legislative history of the statute, that Congress intended to create a private damages remedy. Second, defendants argue that § 14(d)(6) does not require that the proration pool be limited to shares tendered at a certain place or by a certain time; rather, the deadlines and mechanics for the tender of shares are set by the terms of the tender offer. Since plaintiff's sole claim under § 14(d)(6) is that the defendants wrongfully accepted late-tendered shares for proration, defendants maintain that at best, plaintiff states only a common law claim for breach of contract.

Because the Court agrees with defendants that plaintiff has failed to allege a violation of § 14(d)(6), we find it unnecessary to reach the more general question of

whether a shareholder who does allege injury stemming from a violation of § 14(d)(6) has a private damages remedy.

The question before us is apparently one of first impression. Plaintiff cannot point to a single case in which a shareholder has attempted to invoke § 14(d)(6) in the manner which he proposes.[6] However, it is neither the novelty of plaintiff's position nor the absence of supporting authority which leads us to reject plaintiff's claim. As set forth below, we find no support for plaintiff's position in either the language or legislative history of the statute.

Section 14(d)(6) does not on its face impose a mandatory proration deadline. It merely provides that all shares tendered "within ten days" of the tender offer "shall be taken up as nearly as may be pro rata...". The mandate of Section 14(d)(6) necessarily implies that there must be at least ten days between the making of the tender offer and the proration deadline. However, as Rules 14d–8[7] and 14d–6(e)(vi)[8] make clear, the actual proration

6. Although plaintiff cites numerous cases and other authorities we find that none of them are conclusive—or even very helpful—on the issue presented herein. The cases cited by plaintiff merely hold that pro rata acceptance of shares is mandatory, or that the tender offeror is not *required* to take up shares tendered after the proration deadline. *See e.g. Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *Schlesinger Investment Partnership v. Fluor Corp.,* 671 F.2d 739, 741 (2d Cir.1982); *Indiana National Bank v. Mobil Oil Corp.,* 457 F.Supp. 1028, 1032 (S.D.Ind.1977), *aff'd,* 578 F.2d 180, 182 (7th Cir.1978). None of the cases cited raises the question whether the proration deadline itself is mandatory under § 14(d)(6). The other commentary and legislative history relied on by plaintiff do reflect an understanding that as a practical matter, shares must be tendered within the ten day period in order to be accepted for proration. *See Bramberg, Sec. Law, Fraud, S.E.C. Rule 10b–5, 6.3(530) (1967); Full Disclosure of Corporate Equity Ownership And In Corporate Takeover Bids: Hearings on S. 510 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency,* 90th Cong., 1st Sess. 82 (1967) (testimony of Philip West, vice-president, New York Stock Exchange). However, they in no way suggest that the deadline is enforceable under § 14(d)(6), as opposed to under the terms of the offer itself.

7. We refer to Rule 14d–8 as it existed at all times relevant to the present action. That Rule provided as follows:

17 C.F.R. § 240.14d–8 Exemption from statutory pro rata requirement.

The limited pro rata provisions of section 14(d)(6) of the Act shall not apply to any tender offer for less than all the outstanding securities of the class for which the tender offer is made to the extent that the bidder provides in the tender offer materials disseminated to security holders on the date of commencement of the tender offer that in the event more securities are deposited during the period(s) described in paragraphs (a) and/or

(b) of this section than the bidder is bound or willing to accept for payment, all securities deposited during such period(s) will be accepted for payment as nearly as practicable on a pro rata basis, disregarding fractions, according to the number of securities deposited by each depositor.

(a) Any period which exceeds ten days from the date of commencement of the tender offer.

(b) Any period which exceeds ten days from the date that notice of an increase in the consideration offered is first published, sent or given to security holders.

Rule 14d–8 has since been revised to require that the offeror accept for proration all shares tendered before the expiration of the tender offer. The revised Rule 14d–8, applicable to all tender offers commenced after December 28, 1982, states:

17 C.F.R. § 240.14d–8 Exemption from statutory pro rata requirements.

Notwithstanding the pro rata provisions of section 14(d)(6) of the Act, if any person makes a tender offer or request or invitation for tenders for less than all of the outstanding equity securities of a class and if a greater number of securities are deposited pursuant thereto than such person is bound or willing to take up and pay for, the securities taken up and paid for shall be taken up and paid for as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor during the period such offer, request or invitation remains open.

8. Rule 14d–6(e)(vi) requires that the tender offer materials include the following:

(vi) If the tender offer is for less than all the outstanding securities of a class of equity securities and the bidder is not obligated to purchase all of the securities tendered, the period or periods, and in the case of the period from the commencement of the offer, the date of the expiration of such period during which the securities will be taken up pro rata pursuant to section 14(d)(6) of the Act or

deadline is left to the terms of the tender offer. Thus the language of § 14(d)(6) and the rules promulgated thereunder would suggest, as defendants contend, that the enforcement of the proration deadline is a matter of contract law.

Plaintiff argues, however, that the legislative purpose of Section 14(d)(6) will be undermined if the Section is not read to prohibit the acceptance for proration of shares tendered after the proration deadline. The Court cannot agree. Section 14(d)(6) is part of a larger scheme designed to protect shareholders of a target corporation who are faced with a tender offer. *See Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). Section 14(d)(6) in particular aims to provide shareholders with adequate time to make a reasoned and informed decision whether or not to tender their shares. As explained by Senator Williams, the sponsor of the Williams Act, the purpose of the Section was to "outlaw tender offers on a first-come, first-served basis and thus eliminat[e] pressure on shareholders to make hasty deposits." 113 Cong.Rec. 854, 855 (January 13, 1967). This purpose is accomplished by establishing a *minimum* period of time, i.e., ten days, during which shareholders can decide whether to tender their shares, with the assurance that any shares tendered during that period will be included in the proration pool. In the present case, plaintiff does not claim that the minimum ten day proration period was not allowed by the defendants or that the shares which he tendered within the proration period were not accepted for proration. Thus the primary purpose of Section 14(d)(6), as well as the letter of the law, would seem to be complied with.

We do not disagree with plaintiff that the goal of § 14(d)(6) and the Williams Act in general goes beyond that of disclosure and seeks "to assure fair treatment of all shareholders who decide to accept a tender offer." Testimony of SEC Chairman Manuel Cohen at a Hearing Before the Senate Subcommittee on Securities, at 36. Pro rata acceptance of shares is "a method of achieving equitable treatment of all stockholders." *Id.* However, this does not mean that Congress intended to make any imperfection in a tender offer or in the proration process remediable under the Williams Act. Many important details of a tender offer, including the date, place and method of tender, are left to the terms of the offer itself, and are enforceable only on a breach of contract theory. We believe that the proration deadline is another such detail. Our holding does not, as plaintiff suggests, leave the offeror with unlimited discretion to accept late-tendered shares. As noted above, the proration deadline established by the offeror must be included in the tender offer materials; failure to adhere to this deadline would presumably give rise to an action for breach of contract.[9] Furthermore, it might be argued that acceptance of a significant number of late tendered shares would amount to a *de facto* extension of the proration date without adequate notice to all shareholders as required by Rules 14d–6(d), 14d–6(e)(vi), and 14e–1(d). However, only those shareholders who were deprived of the opportunity to tender after the deadline would have standing to pursue such a claim. See discussion, *infra.*, at 50–52.

To hold that the proration deadline is enforceable under § 14(d)(6) would, we believe, unduly involve the federal courts in questions concerning the mechanics of a tender offer. In order to determine whether a purchaser properly accepted shares for proration, the courts would necessarily have to determine what constitutes valid tender under the terms of the tender offer, and whether all of the shares accepted

Rule 14d–8 (§ 240.14d–8), and the present intention or plan of the bidder with respect to the tender offer in the event of an oversubscription by security holders.

**9.** Although we have no occasion to rule on the merits of plaintiff's contract claim in the present opinion, we note that paragraph 5 of the tender offer, which reserves to the offeror the right to waive any defects or irregularities in the tender of shares, does not necessarily defeat such a claim. We would not construe paragraph 5 in a manner which would nullify the proration deadline set by the tender offer.

were validly tendered by the proration deadline. Even a technical defect in tender, if waived by the purchaser, would presumably constitute a violation of § 14(d)(6).[10] In short, the federal securities law would be converted into an omnibus tool for enforcing the terms of a tender offer. We do not believe that Congress intended such a result.

In sum, based on the plain language of § 14(d)(6) and the rules promulgated thereunder, the legislative history of the statute, and the absence of any judicial authority to the contrary, we conclude that plaintiff's allegations that the defendants accepted for proration shares tendered after the proration deadline, do not state a claim under § 14(d)(6). Accordingly, plaintiff's First Cause of Action must be dismissed.

### Section 14(e) Claim

Plaintiff's second claim, arising under the anti-fraud provision of the Williams Act,[11] is based on an alternative statement of the facts. The Second Amended Complaint alleges that the press releases issued by defendants contained material misstatements as to the number of shares tendered or perfected by the proration date, which were relied on by plaintiff in deciding not to engage in hedging transactions with respect to the shares which he believed the defendants would purchase, and that plaintiff suffered monetary damage as a result.

Defendants argue that plaintiff's § 14(e) claim is fatally defective in several respects. First, they claim that because

plaintiff's injury does not arise out of his decision to tender, it is not remediable under § 14(e). In addition, defendants claim that plaintiff has failed to adequately plead the essential elements of a fraud claim, including scienter, materiality, reliance, injury and causation. Each of defendants' claims are discussed separately below.

### Plaintiff's Failure to Claim Injury Arising Out of His Decision Whether to Tender

Defendants contend that "[s]ince there is no averment that defendants' allegedly misleading statements impacted any shareholder's decision to tender or withdraw his Marathon shares, this case simply does not present the evil which § 14(e) was designed to remedy." Memorandum of Defendants United States Steel Corporation and USS, Inc. in Support of Motion to Dismiss Second Amended Complaint, at 2. Defendants draw on the legislative history of § 14(e) which, in the words of the Supreme Court, reveals that the "sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Piper v. Chris-Craft Industries Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977) (*"Chris-Craft"*). In light of this purpose, defendants argue that a shareholder in the position of plaintiff, whose alleged injury did not arise from his decision whether or not to tender, does not have standing to bring a cause of action under § 14(e).

---

**10.** The facts in this case are illustrative. The December 8th press release announced that about 54 million shares of Marathon stock had been *tendered*. The intermediate press announcements stated that approximately 51 million shares had been *perfected*. The final number of shares accepted for proration was close to the 54 million figure. One possible interpretation of these facts is that U.S. Steel accepted several million shares for proration, with respect to which tender had been *attempted* but not *perfected* by the proration date ("perfection" meaning the completion of a check on the validity of each share's certificate and the matching of certificate against prior guarantees of delivery). Under plaintiff's proposed construction of § 14(d)(6), defendant's acceptance of these shares would presumably constitute a violation

of the securities law, solely because the tender of these shares was technically deficient.

**11.** Section 14(e) of the Williams Act provides in relevant part:

[e] It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

Plaintiff responds that § 14(e) broadly prohibits fraud "in connection with a tender offer." Relying on Judge Lasker's decision in *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179 (S.D.N.Y.1981), plaintiff argues that as long as the alleged mistatements which gave rise to his injury were made "in connection with a tender offer", the fact that he was engaging in option transactions at the time he was injured, should not defeat his cause of action under § 14(e).

Although the Supreme Court in *Chris-Craft, supra,* at 42 n. 28, 97 S.Ct. at 949 n. 28, expressly reserved decision on the issue, the lower courts have uniformly implied rights of action under § 14(e), on behalf of both tendering and non-tendering shareholders injured by fraudulent misrepresentations impacting on their decisions whether to tender. *See, e.g., Stull v. Bayard,* 561 F.2d 429, 432 (2d Cir.1977) ("Although § 14(e) does not specifically provide plaintiff a cause of action for this deprivation such a right to sue has generally been inferred"), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978); *Electronic Specialty Co. v. International & Controls Corp.,* 409 F.2d 937, 940 (2d Cir.1969); *Myers v. American Leisure Time Enterprises, Inc.,* 402 F.Supp. 213, 214 (S.D.N.Y. 1975), *aff'd mem.,* 538 F.2d 312 (2d Cir. 1976); *Petersen v. Federated Development Co.,* 416 F.Supp. 466, 472 n. 2 (S.D.N.Y. 1976); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 596 (5th Cir.1974), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *In re Com. Oil/Tesoro Petroleum Corp. Sec. Lit.,* 467 F.Supp. 227, 242 (W.D.Tex.1979); *Hurwitz v. R.B. Jones Corp.,* 76 F.R.D. 149 (W.D.Mo.1977); *Scott v. Multi-Amp Corp.,* 386 F.Supp. 44, 50 (D.N.J.1974); *contra, Neuman, v. Electronic Specialty Co.,* Fed.Sec.L.Rep. (CCH) ¶ 92, 591 (N.D.Ill.1969) (since non-tendering shareholders are neither purchasers nor sellers of securities they have no standing to sue for damages under either 10b–5 or § 14(e)). However, few courts have considered whether shareholders who claim reliance and injury outside of their decisions whether to tender, have standing to sue under § 14(e). Those which have, have reached differing results. *See O'Connor & Associates v. Dean Witter Reynolds, Inc., supra; Panter v. Marshall Field & Co.,* 646 F.2d 271 (7th Cir.1981).[12] Furthermore, in both *O'Connor* and *Panter,* the

---

**12.** Judge Lasker, in *O'Connor,* concluded that an options trader who alleged injury arising out of pre-tender offer trading in the options of the target company, as a result of an insider's failure to disclose an impending announcement of a tender offer proposal, stated a claim under § 14(e) and Rule 14e–3, the Rule prohibiting insider trading. In so holding, Judge Lasker rejected the defendants' contention that the Williams Act was intended to regulate only transactions between the tender offeror and target shareholders and not open market transactions. He refused to find that plaintiff lacked standing because he traded in options rather than the shares of the target company. Judge Lasker also rejected defendants' argument that § 14(e) applied only when an actual tender offer has been made, stating that, "the alleged failure to disclose the impending announcement of the tender offer proposal worked to deny the target investor the relevant information on which to decide whether to sell his shares in the same manner as fraudulent conduct operates when an offer has been publicly announced." *Id.* at 1191.

In *Panter,* the 7th Circuit held that target shareholders who alleged injury arising from their pre-tender offer decisions not to sell their shares in the open market, did not have a claim under § 14(e). The Court found that "a damages remedy for investors who determine not to sell in the marketplace when no tender offer ever takes place was not intended to be covered by § 14(e) of the statute" *Id.* at 285. The Court relied on both the language of § 14e which makes the statute applicable to fraud "in connection with a tender offer", and the legislative history of the Act, which in the Court's view, revealed "that Congress intended to protect an investor faced with the pressures generated by the exigencies of the tender offer context, and that the sole purpose of § 14e is protection of the investor faced with the decision to tender or retain his shares." *Id.* The Court found that shareholders in a pre-tender offer situation "were simply not subject to the proscribed pressures the Williams Act was designed to alleviate." *Id.* at 296. The Court also dismissed plaintiff's claim that misrepresentations made by the target company during the pre-tender offer period caused the tender offer to fall through, thus depriving the shareholders of the opportunity to tender their shares to the offeror at the premium market rate, on the ground that plaintiffs had alleged no reliance. *Id.* at 284–85.

plaintiffs alleged injury resulting from pre-tender offer decisions, where impending tender offers never became effective. Thus the courts in those cases were faced with the question not presented here, of whether the alleged misstatements/omissions were made "in connection with" a tender offer. Our research has disclosed no cases which have addressed the precise issue raised herein.

■■■ In considering the scope of a cause of action under § 14(e), we are mindful that "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purpose'". *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) *quoting, SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963). At the same time, we recognize that "generalized references to the 'remedial purposes'" of the securities laws "will not justify reading a provision 'more broadly than its language and the statutory scheme reasonably permit.'" *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) *quoting, SEC v. Sloan*, 436 U.S. 103, 116, 98 S.Ct. 1702, 1710, 56 L.Ed.2d 148 (1978).

■■ There is nothing in the language of § 14(e) which would limit the applicability of the statute in the manner proposed by defendants. Section 14(e) prohibits any untrue statements made in connection with any tender offer. Defendants do not and cannot deny that the allegedly false statements in this case were made in connection with a tender offer. They were made by the offeror during the course of the tender offer and pertained directly to shares which had been tendered pursuant to the tender offer.[13]

Turning to the history and purpose of the statute, it is undeniable that Congress' primary concern, in enacting § 14(e) was with the dilemma of shareholders faced with the decision whether or not to tender their shares. As Senator Williams stated during the congressional hearings:

Today, the public stockholder in deciding whether to reject or accept a tender offer possesses limited information. No matter what he does, he acts without adequate knowledge to enable him to decide rationally what is the best course of action. This is precisely the dilemma which our securities laws are designed to prevent.

113 Cong.Rec. 24662–66 (1967). Further:

In the rather common situation where existing management or third parties contest a tender offer, shareholders may be exposed to a bewildering variety of conflicting appeals and arguments designed to persuade them either to accept or to reject the tender offer.

*Id.*, at 855–56.[14] There is no discussion in the legislative history of any other type of decision which a shareholder might face in connection with a tender offer. However, we do not infer from this silence any intent on the part of Congress to limit the Act's protection to shareholders confronted with the decision whether to tender.

---

**13.** In fact, the offer itself stated that an announcement as to the final proration factor would be made approximately nine New York Stock Exchange ("NYSE") trading days after the proration date. See Offer to Purchase, Section 1, p. 3.

**14.** A Senate Report similarly focused on the dilemma of a shareholder confronted with the decision whether to tender:

He has many alternatives. He can tender all of his shares immediately and hope they are all purchased. However, if the offer is for less than all the outstanding shares, perhaps only a part of them will be taken. In these instances, he will remain a shareholder in the company, under a new management which he has helped to install without knowing whether it will be good or bad for the company.

The shareholder, as another alternative, may wait to see if a better offer develops, but if he tenders late, he runs the risk that none of his shares will be taken. He may also sell his shares in the market or hold them and hope for the best. Without knowledge of who the bidder is and what he plans to do, the shareholder cannot reach an informed decision.

S.Rep. No. 550, 90th Cong., 1st Sess. 2–3 (1967).

As the facts of the present case illustrate, the decision whether to accept or reject a tender offer is not the only significant decision which a target shareholder may face in the tender offer context. *See also O'Connor & Associates v. Dean Witter Reynolds, Inc., supra,* 529 F.Supp. at 1191. Nor is it the only decision to which statements made "in connection with" a tender offer, may be material. According to the facts alleged herein, plaintiff, having decided to tender his shares, was subsequently confronted with the decision how to best dispose of the shares which would be returned to him unpurchased; one alternative was to sell options with respect to these shares prior to their actual return. Given the fact that the tender offer was for less than the total number of outstanding securities, and thus subject to the proration requirement of § 14(d)(6), the dilemma which plaintiff faced was a readily foreseeable consequence of his decision to tender. Moreover, plaintiff was totally dependent on the offeror to provide him with the facts upon which to make an informed decision; only the offeror had knowledge of how many shares had been properly tendered by the proration deadline. Thus as with the decision to tender, the need for informed decision-making was great, and the possible consequences of a decision based on erroneous information was significant and foreseeable.

In short, this Court can find no principled reason to exclude a shareholder in the position of plaintiff from the protection of § 14(e).[15] Therefore, in the absence of any affirmative indication of congressional intent, we are unwilling to assume that Congress intended to so limit the scope of § 14(e).

Defendant relies heavily on the "sole purpose" language of the Supreme Court in *Chris-Craft, supra.* However, as Judge Lasker observed in *O'Connor, supra,* "that statement was made in the context of

the Court's consideration of the issue whether there existed 'a private cause of action for damages by one of several contending offerors against a successful bidder or by a losing contender against the target corporation.'" *Id.* at 1192, *quoting Chris-Craft, supra,* 430 U.S. at 35, 97 S.Ct. at 946. The Court had no occasion to consider which type of shareholders the statute was designed to protect, or which types of injuries the statute was designed to remedy. Therefore, nothing in the *Chris-Craft* decision is determinative of the issue before us.

Likewise, the Second Circuit's decision in *Lewis v. McGraw,* 619 F.2d 192 (2d Cir. 1980), *cert. denied,* 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1981), is not controlling. In *McGraw,* the target shareholders sued the corporation and its directors, alleging that the board made false statements of material facts in response to a proposed tender offer. The shareholders claimed that had the board provided complete truthful information, the tender offer would have been consummated. The Court of Appeals affirmed the district court's dismissal of the complaint, for failure to allege reliance, an essential element of a cause of action under § 14(e). The Court reasoned that the shareholders could not possibly have relied on the alleged misrepresentations by the target corporation, since they were never given an opportunity to tender their shares. In response to the plaintiff's argument that reliance should be presumed from materiality, the Court stated that, "[h]ere, where no reliance was possible under any imaginable set of facts, such a presumption would be illogical in the extreme." *Id.* at 195. In the present case, unlike *McGraw,* plaintiff alleges that he relied on defendants' alleged misrepresentations, in connection with his hedging activities. Therefore, we cannot say that no reliance was possible. Like Judge Lask-

---

**15.** In holding that this plaintiff has standing to sue under § 14(e), we do not mean to suggest that every conceivable injury suffered by a shareholder as a result of fraud "in connection with" a tender offer is remediable under the

statute. There may be some shareholder decisions and resultant injuries, which are simply too remote from the decision whether to tender to warrant Williams Act protection.

er, "we do not read the *McGraw* opinion to constitute a broad interpretation of the general reach of § 14(e), but rather to consider the statute's application in the circumstances of that case." *Id.* at 1192–93.

Finally, defendants argue that the rationale of the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), precludes a shareholder in plaintiff's position, from asserting a claim under § 14(e). In *Blue Chip*, the Supreme Court held that since the plaintiff was neither a purchaser or seller of the securities in issue, he had no standing to sue under § 10(b) and Rule 10b–5, which prohibit fraudulent misstatements or omissions in connection with the purchase or sale of any security. The Court refused to recognize a claim based on the plaintiff's *failure* to buy or sell the security in question. Defendants argue that *"[a] fortiori*, there can be no claim where, as here, there is a claimed failure to buy or sell a security (i.e., a "put" or a "call") different from the security (the Marathon shares) to which the alleged misrepresentation relates. [footnote omitted]." Memorandum of Defendants United States Steel Corporation and USS, Inc. in Support of Motion To Dismiss the Second Amended Complaint at 3.[16]

This Court does not agree that the *Blue Chip* decision warrants dismissal of plaintiff's § 14(e) claim. Section 10(b), the statute at issue in *Blue Chip*, and Rule 10b–5, explicitly prohibit fraud in connection with a "purchase" or "sale" of securities. Since § 14(e) has no such language, there is no basis for reading a purchaser/seller requirement into it. Thus the courts have held that non-tendering shareholders, as well as tendering shareholders, have standing to sue under § 14(e), notwithstanding the holding in *Blue Chip Stamps*. *See Hundahl v. United Benefit Life Ins. Co.,* 465 F.Supp. 1349 (N.D.Tex.1979); *Hurwitz v. R.B. Jones Corp.,* 76 F.R.D. 149 (W.D. Mo.1977). Moreover, plaintiff claims that he did engage in hedging transactions with respect to at least some of the shares he expected would be returned to him. Thus, his claim that he would have hedged with respect to the 3.2% which he did not know would be returned, is not totally dependent upon uncorroborated oral evidence.

For all of the foregoing reasons, this Court concludes that plaintiff's § 14(e) claim should not be dismissed for lack of standing.

### *Scienter*

Defendants argue that the Second Amended Complaint fails to adequately plead "scienter", i.e., intentional or reckless conduct, on the part of defendants. Ac-

---

**16.** Defendants claim that the policy concerns expressed by the Supreme Court in *Blue Chip* are equally apt in the present case. The Court reasoned that without a purchaser-seller requirement, an action under 10b–5 would:

> turn largely on which oral version of a series of occurrences the jury may decide to credit, and therefore no matter how improbable the allegations of the plaintiff, the case will be virtually impossible to dispose of prior to trial other than by settlement.

*Id.* at 742, 95 S.Ct. at 1928.

> . . . .
>
> Plaintiff's proof would not be that he purchased or sold stock, a fact which would be capable of documentary verification in most situations, but instead that he decided *not* to purchase or sell stock. Plaintiff's entire testimony could be dependent upon the uncorroborated oral evidence of many of the crucial elements of his claim, and still be sufficient to go to the jury. The jury would not even have the benefit of weighing the plaintiff's version

against the defendant's version, since the elements to which the plaintiff would testify would be in many cases totally unknown and unknowable to the defendant. The very real risk in permitting those in respondent's position to sue under Rule 10b–5 is that the door will be open to recovery of substantial damages on the part of one who offers only his own testimony to prove that he ever consulted a prospectus of the issuer, that he paid any attention to it, or that the representations contained in it damaged him.

*Id.* at 746, 95 S.Ct. at 1930 [Emphasis in original, footnote omitted].

According to the defendants, plaintiff's claim that he would have done something with the additional 3.2% of stock, had he known that that stock would be returned to him, would rest purely on uncorroborated oral evidence as to plaintiff's intent. Defendants would have no way of disproving the internal operations of plaintiff's mind, and the minds of the members of the proposed class.

cording to defendants, the facts as alleged by plaintiffs at best raise an inference of negligence. In particular, defendants emphasize the total absence of any facts from which a motive for the fraud alleged might be inferred.

In response, plaintiff argues that there are two operative portions of § 14(e), the first of which imposes an obligation of full disclosure, and the second of which prohibits fraud.[17] According to plaintiff, the first clause of § 14(e), i.e., the disclosure requirement, does not require a showing of scienter. Alternatively, plaintiff maintains that even if scienter is an essential element of his § 14(e) claim, he has adequately pleaded scienter in accordance with the federal rule that "intent" and "condition of mind" need only be averred generally. Plaintiff rejects defendant's suggestion that plaintiff must speculate as to the possible motive defendants may have had for making the alleged misrepresentations.

Plaintiff's argument that a showing of scienter is not a requirement in every action brought under § 14(e) is contrary to precedent in this circuit and others. Because of the close similarity between § 14(e) and Rule 10b–5, in both language and purpose, courts have consistently held that the elements of a cause of action under § 14(e) and Rule 10b–5 are the same,

with the exception of the standing requirement,[18] and have applied the case law under each interchangeably. *See, e.g., Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir.1973); *Atchley v. Qonaar Corp.*, 704 F.2d 355, 359 (7th Cir.1983); *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 431 (6th Cir.1980); *Berman v. Gerber Products Co.*, 454 F.Supp. 1310, 1316 (W.D.Mich.1978); *SEC v. Texas International Co.*, 498 F.Supp. 1231 (N.D.Ill.1980); *Applied Digital Data Systems v. Milgo Electronic*, 425 F.Supp. 1145, 1157 (S.D.N.Y.1977). It is firmly established that an action under Rule 10b–5 requires a showing of scienter, *i.e.*, "intent to deceive, manipulate or defraud." *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976). Therefore, we conclude that proof of scienter is also required in an action under § 14(e). *See Indiana National Bank v. Mobil Oil Corp., supra*, 578 F.2d 180, 184 n. 10; *Lowenschuss v. Kane*, 520 F.2d 255, 268 (2d Cir.1975); *Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra*, 480 F.2d at 363–64; *Adams v. Standard Knitting Mills, Inc., supra*, 623 F.2d at 431; *Morgan v. Prudential Group, Inc., supra*, 81 F.R.D. 418, 426 (S.D.N.Y.1978); *Applied Digital Data Systems v. Milgo Electronic supra*, 425 F.Supp. at 1157.[19]

**17.** The first clause referred to by plaintiff makes it unlawful for "any person to make any untrue statement of a material fact...". The second clause makes it unlawful "to engage in any fraudulent, deceptive, or manipulative acts or practices."

**18.** Rule 10b–5 is applicable only "in connection with the purchase or sale of any security." As construed by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), an action under 10b–5 can only be brought by a purchaser or seller of a security. There is no comparable standing requirement in an action under § 14(e) since § 14(e) applies "in connection with any tender offer..."

**19.** The Court recognizes that the analogy drawn between Rule 10b–5 and § 14(e) is, with respect to the issue of scienter, somewhat imperfect in light of the *Ernst & Ernst* decision. In holding that a violation of Rule 10b–5 requires proof of

scienter, the Supreme Court relied heavily on the language of § 10(b), the statute under which Rule 10b–5 was promulgated. In particular, the Court found that the use of the words "manipulative or deceptive" and "device or contrivance" strongly suggested that Congress intended to proscribe only knowing or intentional misconduct. *Ernst & Ernst v. Hochfelder, supra*, 425 U.S. at 197, 96 S.Ct. at 1382. As the Sixth Circuit noted in *Adams v. Standard Knitting Mills, Inc., supra*, 623 F.2d at 430, Congress also used the words "fraudulent", "deceptive" and "manipulative" in § 14(e). However, the language and structure of § 14(e) is otherwise completely different from that of § 10(b). As plaintiff points out, § 14(e) consists of two clauses, arguably two separate proscriptions, which are separated by the word "or". The second clause uses the words found to be significant in *Ernst & Ernst*. The first clause merely states that it shall be unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to

■ Under the law of this circuit, the scienter requirement does not mean that plaintiff must prove intent to defraud; a showing that defendants had knowledge of the falsity of their statements or reckless disregard for the truth is sufficient.[20] *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 45–47 (2d Cir.1978); *IIT v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1300–02 (2d Cir.1973); *Chris-Craft, supra,* 480 F.2d at 363. A showing of mere negligent conduct, however, will not suffice. *Chris-Craft, supra,* 480 F.2d at 363. We therefore turn to the question of whether plaintiff has adequately pleaded knowing, intentional, or reckless conduct on the part of the defendants.

■ We note from the outset that Rule 9(b) of the Federal Rules of Civil Procedure does not require the same specificity of pleading with respect to intent and knowledge as it does with respect to the other elements of fraud. *Zaretsky v. E.F. Hutton & Co., Inc.,* 509 F.Supp. 68 (S.D.N.Y. 1981). By its own terms Rule 9(b) provides that "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally." Nevertheless, to survive a motion to dismiss, the facts alleged in the complaint "must be such as to permit an inference of fraud." *Denny v. Barber,* 73 F.R.D. 6, 9 (S.D.N.Y.1977). This does not mean, as defendants would have it, that the facts pleaded must suggest the defendants' *motive.*[21] It is sufficient that facts

---

make the statements made, in light of the circumstances under which they are made, not misleading." This is precisely the language of paragraph (b) of Rule 10b–5, about which the Supreme Court stated:

> Viewed in isolation, the language of subsection (b), ... could be read as proscribing, ... any type of material misstatement or omission, ... that has the effect of defrauding investors, whether the wrongdoing was intentional or not.

*Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 212, 96 S.Ct. at 1390. However, the Court ultimately rejected this reading of Rule 10b–5 on the grounds that it would be inconsistent with the administrative history of the Rule and even more importantly, would exceed the power granted the Commission under § 10(b). *Id.* at 212–214, 96 S.Ct. at 1390–1391.

In *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1979), the Supreme Court again construed language similar to that found in the first clause of § 14(e) and paragraph (b) of Rule 10b–5. The Court found that Section 17(a) of the Securities Act of 1933 required scienter under sub-section (a)(1), but not under sub-section (a)(2) or (a)(3). As the Court stated:

> By contrast [to the language of (a)(1) ], the language of 17(a)(2), which prohibits any person from obtaining money or property "by means of any untrue statement of a material fact or any omission to state a material fact," is devoid of any suggestion whatsoever of a scienter requirement. As a well-known commentator has noted "[t]here is nothing on the face of Clause (2) itself which smacks of *scienter* or intent to defraud." 3 L.Loss, *Securities Regulation* 1442 (2d ed.1961).

*Id.* at 696, 100 S.Ct. at 1955. The Court concluded that since there was no expression of legislative intent in the legislative history of the Act,

the plain meaning of the statute must prevail. *Id.* at 697, 700, 100 S.Ct. at 1956, 1957.

In light of the Supreme Court's dicta regarding the language of Rule 10b–5 in *Ernst and Ernst* and its subsequent decision in *Aaron,* we find that the language of § 14(e) raises problems of construction which simply were not present in *Ernst and Ernst.* Whereas the Supreme Court deemed the language of § 10(b) to be clear on the issue of scienter, the language of § 14(e) is not. Furthermore, there is no clear indication in the legislative history of § 14(e) as to congressional intent with respect to a scienter requirement.

Despite our reservations about applying the holding in *Ernst and Ernst* to an action under § 14(e), we are not inclined to deviate from clear Second Circuit authority holding that the principles governing Rule 10b–5, should also be applied under § 14(e). Accordingly, we hold that scienter is an essential element of a cause of action under § 14(e).

**20.** "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' [citation omitted]." *Rolf v. Blyth, Eastman Dillon & Co., Inc., supra,* 570 F.2d at 47.

**21.** We agree with defendants that it is difficult to fathom any way in which the defendants could have benefited from the fraud alleged in this case, and we have no doubt that this apparent lack of motive will be a significant factor at trial. However, we do not believe that the absence of personal motive is conclusive on the issue of scienter and we therefore decline to dismiss plaintiff's § 14(e) claim on this ground.

alleged give rise to an inference that the defendants acted knowingly or recklessly. *See Ross v. A.H. Robins Company, Inc.,* 607 F.2d 545, 558 (2d Cir.1979) In the present case, plaintiff must allege facts which permit an inference that as of December 17 and December 24, 1981, defendants had knowledge of how many shares had actually been tendered by the proration deadline, or recklessly failed or refused to ascertain the number from information available to them.

The relevant section of the Complaint is found in paragraphs 59–65 wherein plaintiff alleges that the defendants had both a duty to know and the means to know how many shares had been perfected as of the proration deadline. In particular, plaintiff alleges that during all relevant times defendants had the staff, facility and resources adequate to determine the number of shares tendered, and in fact maintained a comprehensive system of records, including records maintained in computers. Plaintiff claims specifically that defendant Bankers Trust "maintained and operated a comprehensive, computerized electronic data processing system for recording and generating up-to-the-minute information and tallies and summaries of shares tendered, guaranteed, delivered, perfected, withdrawn, eligible for purchase and accepted to be accepted for purchase," Second Amended Complaint ¶ 64. In addition, plaintiff alleges that Bankers Trust had a duty to provide such information to the other defendants and in fact, "Bankers Trust prepared and provided regular writ-ten reports of such information (including a report entitled 'Daily Report of Securities Tendered') to defendant [U.S. Steel] and its other agents, and in addition made frequent verbal or telephoned reports of such information to defendant U.S. Steel and its other agents." Second Amended Complaint ¶ 65.

Whether these allegations are sufficient to support a claim of fraud is a close question. While the facts alleged *permit* an inference that the defendants acted recklessly or with knowledge, they just as easily permit an inference that one or more of the defendants were negligent, either in their record-keeping or in the carrying out of their duty to accurately convey the information which they had recorded.[22] In fact, the inference of negligence may be somewhat stronger than the inference of scienter, in light of the defendants' apparent lack of motive to commit fraud. Nevertheless, although we are doubtful of plaintiff's ability to prove scienter at trial we do not believe the issue can be decided on the pleadings. Therefore, defendants' motion to dismiss plaintiff's § 14(e) claim on this ground will be denied.

### Materiality

Defendants also argue that plaintiff has failed to adequately plead materiality.[23] In Paragraph 74 of the Second Amended Complaint plaintiff alleges:

The number of shares validly tendered by delivery within the proration deadline,

---

**22.** We note that in paragraphs 50 and 68 of the Complaint, plaintiff himself, appears to be alleging negligence in the alternative. These paragraphs contain "or should have known" clauses which would not alone satisfy the scienter requirement. However, since these paragraphs allege in the disjunctive that defendants "knew" of their misrepresentations, they are adequate as a matter of pleading to allege scienter. *See IIT v. Cornfeld, supra,* 619 F.2d at 924.

**23.** It is undisputed that to establish a violation of § 14(e) plaintiff must establish the materiality of the misstatements which defendants allegedly made. Under § 14(e) a misstatement or omission is "material if there is a substantial likelihood that a reasonable shareholder would consider it important" to his decision whether to tender or as we have decided here, to his decision how to best dispose of tendered shares which will be returned to him unpurchased. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed. 757 (1976); *Seaboard World Airlines, Inc. v. Tiger International, Inc.,* 600 F.2d 355, 361 (2d Cir. 1979).

Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. *TSC Industries, supra,* 426 U.S. at 449, 96 S.Ct. at 2132.

from which the proration factor and the number of Unpurchased Shares are calculated, was a material fact of substantial significance to plaintiff and to all tendering shareholders who wished to or did attempt to reduce losses incurred in connection with the sale or disposition of Unpurchased Shares by engaging in short sales or other hedging transactions for the purpose of protecting themselves against the risks of proration.

■■■ Plaintiff also argues that information as to the true number of Marathon shares deposited by midnight of December 16 was "obviously 'material'" because "any change ... would alter the amount the shareholder will receive" and thus "would be of significance to a shareholder in determining what to do." Plaintiff's Memorandum in Opposition at 73, 74. Defendants maintain that plaintiff's general allegation as to materiality is totally unsupported by, and in fact inconsistent with, other facts alleged in the Complaint.

Defendants argue first that the use of the word "approximately" in both the December 17 and 21 press releases, makes clear that the press releases did not purport to give an exact count of the numbers of shares tendered, or of shares tendered which had been perfected, but only a rough figure. Defendants also question how there could be any "material" difference between "approximately 51 million" shares and the "53,880,360 shares" actually accepted for proration. Defendants' contentions raise two related questions: first, is there "a substantial likelihood that a reasonable shareholder" would consider such an "approximate" figure important to any investment decision?; and second, would a reasonable shareholder find that "approximately 51 million" shares is materially different than "53.88 million shares"?

Defendants further argue that because plaintiff has failed to allege that he hedged *all* of the shares that he thought would be returned to him unpurchased there is no basis for assuming that plaintiff would have hedged with respect to the additional 3.2% of the shares which were unexpectedly returned to him. In other words, since there is no allegation from which it can be inferred that the additional 3.2% would have been relevant to any hedging decision which plaintiff made or might have made, the allegedly erroneous press releases should be found to be immaterial as a matter of law.

Although we believe that each of these issues may pose serious problems for plaintiff at trial, we do not believe that they can be resolved against plaintiff as a matter of law. What the Supreme Court said of the materiality question in the context of a summary judgment motion is equally apt here:

The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, (footnote omitted) we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. [footnote omitted].

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Accordingly, we conclude that plaintiff should be given the opportunity to prove the materiality of defendants' alleged misstatements at trial.[24]

### Reliance, Injury and Loss Causation

The Second Amended Complaint is particularly sketchy in the area of reliance and

---

**24.** Plaintiff states in his latest Memorandum that he "expects to be able to prove at trial that shareholders and the financial community reasonably expected defendants' announcements to be substantially correct and accurate, and that the words 'approximately 51 million' shares were not commonly interpreted to mean 'maybe 54 million.'"

injury. Plaintiff alleges that he reasonably relied on defendants' press releases to determine the number of unpurchased shares which were to be returned to him. In order to reduce losses which he expected would be incurred in connection with the sale of the unpurchased shares, plaintiff engaged in a series of hedging transactions during the period of the tender offer. Because of his reliance on defendants' statements, plaintiff allegedly suffered financial injury and losses because he was forced to sell the additional unpurchased shares at the lower market prices prevailing on and after January 7, 1982. *See* ¶¶ 70, 77–80 of the Second Amended Complaint.

More significant than what is included in the Complaint, is what is missing. The Complaint totally fails to allege the details of plaintiff's hedging transactions, including the type of hedging transactions plaintiff engaged in, how many shares were included in the transactions, precisely when

the transactions took place,[25] what specifically caused plaintiff's financial losses, what specifically plaintiff would have done to prevent those losses had he had the correct information, and whether he was actually able to cut his losses with respect to the shares he did hedge on.[26]

In light of these omissions, the Court finds that the Second Amended Complaint is not sufficiently specific in the areas of reliance, injury and causation to satisfy Rule 9(b). However, plaintiff will be granted one final opportunity to amend the Complaint.

*Plaintiff's Claims Under Rules 14d–6(d), 14d–6(c) and 14e–1(d)*

Plaintiff has also made claims under Rule 14d–6(d), 14d–6(e) and 14e–1(d). Each of these rules seeks to protect target company shareholders faced with a tender offer decision by imposing disclosure requirements on the tender offeror.[27] Plaintiff

---

**25.** Although plaintiff alleges that the transactions occurred during the period of the tender offer, he does not allege when they occurred in relation to the various announcements. As the defendants point out, the sequence of events is relevant to the issue of reliance:

> If plaintiff engaged in hedging transactions before December 8, he did so on the basis of no announcements as to the number of shares tendered, because there were none. If he engaged in hedging transactions between December 8 and December 17, then he did so in reliance upon what ultimately proved to be the correct number of shares tendered, i.e. the December 8 announcement of "about 54 million shares."

Memorandum of Bankers Trust Company in Respect of the Fourth Claim in the Second Amended Complaint.

**26.** We assume that the essence of plaintiff's claim is that he lost money because he did not hedge with respect to any of the shares he believed would be purchased. We assume further that plaintiff claims he would have hedged with respect to the 3.2% additional shares which were returned to him had he known that such shares would not be purchased and that he would have been able to sell them at a higher price than he was able to after January 6. However, none of these allegations are clearly spelled out in the Complaint. In fact, the Complaint states that plaintiff "suffered financial injury and losses *in connection with his hedging transactions* and with the eventual disposition or sale of Unpurchased Shares." If plaintiff in fact lost money by hedging, he presumably

would have lost *more* money if he had engaged in additional hedging with respect to the 3.2%. This suggests that plaintiff's losses were caused by the tender offer itself, and its subsequent effect on the market, and not by the alleged misrepresentations by the defendants.

**27.** The rules provide in pertinent part as follows:

> Rule 14d–6(d)
> (d) Material changes. A material change in the information published or sent or given to security holders shall be promptly disclosed to security holders in additional tender offer materials.
> Rule 14d–6(e)
> (e) Information to be included—(1) Long-form publication and tender offer materials. The information required to be disclosed by paragraphs (a)(1), (a)(2)(ii), (a)(3)(i)(B) and a(4) of this section shall include the following:
> (iv) The scheduled expiration date of the tender offer, whether the tender offer may be extended and, if so, the procedures for extension of the tender offer.
> (vi) If the tender offer is for less than all the outstanding securities of a class of equity securities and the bidder is not obligated to purchase all of the securities tendered, the period or periods, and in the case of the period from the commencement of the offer, the date of the expiration of such period during which the securities will be taken up pro rata pursuant to section 14(d)(6) of the Act or Rule 14d–8 (§ 240.14d–8), and the present in-

argues that defendants violated these rules by failing to disclose to all shareholders that late-tendered shares would be accepted for proration, or, in other words, that the proration deadline was being extended.

█ The problem with plaintiff's claim under the disclosure rules is one of standing. Plaintiff does not and cannot claim that he would have tendered or withdrawn his shares after December 4, 1981, had he known that the proration deadline was being "extended". Thus even assuming that plaintiff alleges a violation of the disclosure rules, he does not allege the type of injury which the rules were designed to prevent. In fact, the only injury which plaintiff alleges, that which allegedly occurred in connection with his hedging activities, does not in any way flow from the defendant's failure to disclose an extension of the proration period. If the injury occurred at all, it occurred because of defendant's failure to disclose the correct number of shares tendered by the proration deadline. However, the rules relied on by plaintiff do not require such disclosure. Accordingly, since plaintiff lacks standing to bring claims under the disclosure rules, these claims must be dismissed.

*Plaintiff's Claim Under Rule 10b–13*

█ Rule 10b–13 prohibits a tender offeror from purchasing target company se-

curities during the effective period of the tender offer "otherwise than pursuant to" the tender offer.[28] Plaintiff apparently claims that by including late-tendered shares in the proration pool, defendants purchased these shares "otherwise than pursuant to" the offer.[29] Under plaintiff's theory it would seem that any deviation, however minor, from the terms of a tender offer in the purchase of shares, would constitute a violation of 10b–13. We do not believe that the SEC intended such a result.

The purpose of the SEC in promulgating Rule 10b–13 was:

> to safeguard the interests of the persons who have tendered their securities pursuant to the stated terms of a tender offer by prohibiting the offeror from making any 'outside' purchases on different terms during the offer's duration.

*Heine v. The Signal Companies, Inc.,* [1976–1977 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 95,898 (S.D.N.Y.1977). In particular, Rule 10b–13 was designed to prevent "outside purchases" by the offeror at a different price than that stated in the tender offer. *See Wellman v. Dickinson,* 475 F.Supp. 783, 833 (S.D.N.Y.1979); *Warren v. Bokum Resources Corp.,* 433 F.Supp. 1360, 1367 (D.N.M.1977); Bloomen-

---

tention or plan of the bidder with respect to the tender offer in the event of an oversubscription by security holders;

Rule 14e–1(d)

As a means reasonably designed to prevent fraudulent, deceptive or manipulative acts or practices within the meaning of section 14(e) of the Act, no person who makes a tender offer shall:

(d) Extend the length of a tender offer without issuing a notice of such extension by press release or other public announcement, which notice shall include disclosure of the approximate number of securities deposited to date and shall be issued no later than the earlier of: (i) 9:00 a.m. Eastern time, on the next business day after the scheduled expiration date of the offer or (ii) if the class of securities which is the subject of the tender offer is registered on one or more national securities exchanges, the first opening of any one of such exchanges on the next business day after the scheduled expiration date of the offer.

**28.** Rule 10b–13 provides in pertinent part:

(a) No person who makes a cash tender offer or exchange offer for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security (or any other security which is immediately, convertible into or exchangeable for such security), otherwise than pursuant to such tender offer or exchange offer, from the time such tender offer or exchange offer is publicly announced or otherwise made known by such person to holders of the security to be acquired until the expiration of the period, including any extensions thereof, during which securities tendered pursuant to such tender offer or exchange offer may by the terms of such offer be accepted or rejected ...

17 C.F.R. § 240.10b–13.

**29.** We note that the 10b–13 issue was not briefed by plaintiff in his responsive papers to defendants' motion to dismiss.

thal, *Securities and Federal Corporate Law* § 13.28[f] (1981); Lowenfels, *Rule 10b–13, Rule 10b–6 and Purchases of Target Company Securities During an Exchange Offer*, 69 Colum.L.Rev. 1392 (1969); SEC Securities Exchange Act Release No. 8712 (Oct. 8, 1969); SEC Securities Exchange Act Release No. 8595 (May 5, 1969); SEC Exchange Act Release No. 8391 (Aug. 30, 1968).

In the present case, plaintiff challenges purchases which were made using the same proration formula and for the same price as every other purchase under the tender offer, including the purchase of plaintiff's own shares. As defendants point out, plaintiff is not really claiming that purchases from the late-tendering shareholders were made outside of the tender offer, but rather, that the "late-tendering shareholders were wrongfully allowed to *participate* in the Offer as if they had made a valid tender." Defendants' April 15, 1982, Memorandum in Support of Motion to Dismiss at 35–36. Therefore, plaintiff does not have a cause of action under Rule 10b–13.

*Plaintiff's Rule 14e–1(c) Claim*

▆ Plaintiff bases his fifth claim on SEC Rule 14e–1(c) which makes it unlawful for a tender offeror to "[f]ail to pay the consideration offered or return the securities deposited by or on behalf of security holders promptly after the termination or withdrawal of a tender offer." 17 C.F.R. § 240.14e–1(c) (1979). Defendants were deemed to have accepted tendered shares shortly after 12:01 A.M. on Thursday, January 7, 1982 (when notice was given to defendant Depository Bankers Trust), and defendants commenced payment for accepted shares on Monday, January 11, 1982. As a consequence of that delay, plaintiff claims that tendering Marathon shareholders were wrongfully deprived of the purchase price for tendered shares and the use thereof, whereas defendants were unjustly enriched by an amount estimated at $6,000,000. Second Amended Complaint ¶¶ 64–65.

Defendants move to dismiss the fifth claim on the ground that payment on the third business day following expiration of the tender offer constitutes "prompt payment" as a matter of law.

For "the only insight into how 'prompt' payment is to be measured," defendants direct the Court's attention to a memorandum issued by the SEC's Department of Corporate Finance. Reply Memorandum of Defendants in Support of Motion to Dismiss at 11. The 1970 memorandum discloses that the Commission intended to direct its rulemaking authority against tender offerors who fail to conclude transactions "in accordance with the practices of the financial community, *usually within five days.*" SEC Exchange Act Release No. 16384 [1979–80 Transfer Binder], Fed.Sec.L.Rep. (CCH) ¶ 82,373 at 82,597 n. 36 (Nov. 29, 1979) [hereinafter cited as SEC Release] (emphasis added). Defendants also present several self-regulatory rules promulgated by the securities industry which support such a five-day rule.[30] With regard to the allegation that it was practicable for defendants to have made payment on January 7, defendants assert that the magnitude of the transaction and the fact that the amount of each check could not be determined until after midnight of January 6, (the deadline for withdrawal) precluded payment prior to January 11. Memorandum of Defendants in Support of Motion to Dismiss at 40.

Plaintiff argues that Rule 14e–1(c) requires that payment be made or commenced immediately upon purchase. Memorandum of Plaintiff in Opposition to Motion to Dismiss at 63 [hereinafter cited as Plaintiff's Memorandum]. Plaintiff charges that it was practicable for defendants to have made payment on January 7, but that defendants chose not to do so, and

---

**30.** Defendants make explicit reference to New York Stock Exchange Rules ¶ 2064, American Stock Exchange Rules ¶ 9274, and National Association of Securities Dealers (NASD) Rules of Fair Practice ¶ 2151, Board of Governors Interpretation .04. Memorandum of Defendants in Support of Motion to Dismiss at 40.

submits a *New York Times* article to support this allegation. Plaintiff's Memorandum, *supra*, at 61–62. The plaintiff also presents instances of recent tender offers in which payment commenced the day following expiration of the offer as evidence of the manner in which tender offer transactions are customarily concluded in the securities industry.[31] Plaintiff's Memorandum, *supra*, at 65–66.

After consideration of the respective positions advanced by the parties, the Court concludes that defendants' motion to dismiss as to this claim should be denied. Although it appears unlikely that plaintiff will ultimately succeed on his "prompt payment" claim, we do not believe the issue can be resolved as a matter of law. The SEC Release relied on by the parties makes clear that the question of prompt payment is a question of reasonableness, to be determined in light of the facts and circumstances of a particular tender offer transaction and the customary practices of the financial community.[32] Furthermore, there is no merit to defendants' contention that the Release conclusively establishes that a three-day delay is reasonable as a matter of law. The portion of the Release relied on by defendants at best establishes that the practice of the financial community is *usually* to complete payment within five days. The use of the word "usually" clearly leaves room for flexibility in the determination of what constitutes prompt payment. Similarly, the specific examples of rules and practices in the securities industry presented by both parties, while relevant to a determination of reasonableness in this case, are certainly not conclusive.

---

**31.** Of course, on this 12(b)(6) motion this Court cannot and will not consider facts outside the pleadings.

**32.** The Release states in pertinent part:

Thus, any person making a tender offer is required to use all reasonable efforts to pay promptly for or to return deposited securities. The Commission recognizes that the operation of this standard will be affected by the practices of the financial community and the following factors: current settlement, handling and delivery procedures relating to tenders made by guaranteed deliveries by appropriate

For the reasons set forth above, the Court finds that plaintiff's Rule 14e–1(c) claim presents factual issues which cannot be resolved on a motion to dismiss. Accordingly, defendants' motion to dismiss this claim is denied.

## CONCLUSION

In conclusion, plaintiff's claims under Section 14(d)(6), § 10(b) and Rules 10(b)13, 14d–6(d), 14d–6(e) and 14e–1(d) (his first, second and third claims for relief) will be dismissed for failure to state a claim. Defendant's motion to dismiss will be denied with respect to plaintiff's claims under § 14(e) and Rule 14e–1(c) (his fourth and fifth claims and relief) and plaintiff's pendent state claims (his sixth and seventh claims for relief).

It Is So Ordered.

---

institutions; procedures to cure technical defects in tenders; and the application of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules promulgated thereunder. The Commission believes that this provision will protect investors by insuring that deposited securities are not tied up for an unreasonable length of time and will not unduly burden either the offeror or its depository in their operations after the termination of the tender offer.

SEC Release, *supra*, at 82, 596 (footnote omitted).