**William B. PRYOR, on Behalf of himself and a Class of other Shareholders of Common Stock of Marathon Oil Company, similarly situated, Plaintiff-Appellant,**

v.

**UNITED STATES STEEL CORP., USS, Inc., and Bankers Trust Company, Defendants-Appellees.**

No. 527, Docket 85–7704.

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1985.

Decided June 25, 1986.

Dale A. Schreiber, New York City (Lawrence C. Browne, Schwartz Klink & Schreiber, P.C., New York City, of counsel), for plaintiff-appellant.

Robert A. Bicks, New York City (James J. Sabella, Breed, Abbott & Morgan, New York City, of counsel), for defendants-appellees United States Steel Corp. and USS, Inc.

David B. Eizenman, New York City (David B. Picker, Moses & Singer, New York, New York City, of counsel), for defendant-appellee Bankers Trust Co.

Before LUMBARD, CARDAMONE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

William B. Pryor appeals from Judge Lowe's dismissal of his claims brought under the federal securities laws on his own behalf and on behalf of a class of similarly situated former shareholders of Marathon Oil Company. *Pryor v. United States Steel Corp.*, 591 F.Supp. 942 (S.D.N.Y. 1984). This dispute arises out of a tender offer made by appellee United States Steel Corp. through its acquisition subsidiary, appellee USS Inc., as the first step in U.S. Steel's two-step acquisition of Marathon.

The Williams Act amendments to the Securities Exchange Act of 1934 and certain rules promulgated thereunder require tender offerors to purchase shares tendered within specified time periods on a pro rata basis and at a uniform price. Accord-ing to the complaint, U.S. Steel included in the proration pool three million shares that were not timely tendered. Pryor alleges that the wrongful inclusion of these shares in the pool diminished the number of his timely-tendered shares that U.S. Steel purchased. Judge Lowe dismissed the portions of the complaint relevant to this appeal [1] pursuant to Fed.R.Civ.P. 12(b)(6), ruling that Section 14(d)(6) of the Williams Act, 15 U.S.C. § 78n(d)(6), did not prohibit an offeror from extending a proration deadline after the offer has been oversubscribed and the deadline has expired, and that SEC Rule 10b–13, 17 C.F.R. § 240.-10b–13 did not prohibit the purchases in question. We reverse with regard to the Section 14(d)(6) claims. Because full relief is available under that Section, we need not decide the claim asserted under Rule 10b–13. We affirm the district court's dismissal of Pryor's claims against appellee Bankers Trust Company.

## BACKGROUND

In late 1981 numerous corporations, including Mobil Corporation and U.S. Steel, expressed interest in acquiring Marathon and thus generated a bidding contest and litigation. On November 19, 1981, U.S. Steel offered $125 per share for 30 million Marathon common shares, 51% of Marathon's outstanding common shares. This proved to be the prevailing bid. According to the complaint, the offer, originally set to expire on December 17, 1981, initially established a "proration date" of November 28, 1981, to govern the purchase of shares should the offer be oversubscribed. The offer provided in part:

> Upon the terms and subject to the conditions of the Offer, if more than 30,000,-000 Shares (or any greater number of Shares to be purchased pursuant to the Offer) shall be validly tendered on the Proration Date and not withdrawn, then Shares so tendered shall be purchased, as provided in Section 2, on a pro rata basis ... according to the number of Shares tendered on the Proration Date

---

1. Other claims asserted in the Third Amended Complaint are not at issue in this appeal.

by each shareholder, and Shares tendered after the Proration Date will not be purchased. If fewer than 30,000,000 Shares are tendered on the Proration Date and not withdrawn, all Shares so tendered and not withdrawn will, subject to the terms and conditions of the Offer, be purchased and any Shares validly tendered thereafter will be purchased on a first-come, first-served basis until 30,-000,000 shares ... shall have been purchased.

In the event of proration, because of the difficulty of determining the precise number of Shares validly tendered, the Purchaser does not expect that it would be able to announce the final proration factor until approximately nine New York Stock Exchange ... trading days after the Proration Date.

This proration procedure is required by Section 14(d)(6).[2] Shareholders must accept the offer by the proration date in order to qualify for the pro rata purchase but can withdraw at any time before the expiration date. 15 U.S.C. § 78n(d)(5). The original proration date, November 28, 1981, was set, also pursuant to Section 14(d)(6), for ten days after the announcement of the offer. However, extensions of the expiration date and of the proration date were necessitated by litigation involving Mobil.[3] On December 1, 1981, a first Supplement to Offer extended the proration date to December 4, 1981. The offer itself was extended, pursuant to an order of the Sixth Circuit, to January 6, 1982.[4]

The offer provided several methods by which Marathon shareholders could tender their shares. One alternative was simply to deliver the shares to Bankers Trust, U.S. Steel's chosen depositary, on or before the proration date, December 4, 1981. Other methods were provided for shareholders without immediate access to their share certificates. These provisions called for notice of acceptance of the offer within the proration period but permitted delivery of a shareholder's certificates by various means within eight New York Stock Exchange trading days after the shareholder's acceptance of the offer. To fall within the proration period under these latter methods, therefore, a shareholder had to accept the tender offer by Friday, December 4 and deliver the shares by Wednesday, December 16.

To summarize, the final offer had a proration date of December 4, 1981, a delivery date of December 16, 1981, and an expiration date of January 6, 1982. Because shareholders who met both the proration and delivery deadlines might nevertheless withdraw their shares at any time on or before January 6, 1982, however, the precise number of shares eligible for pro rata purchase could not be determined before this last date.

The offer contained a provision enabling U.S. Steel to determine the validity of tenders. It stated:

> All questions as to the validity, form, eligibility (including time of receipt) and acceptance of any tender of Shares will be determined by the Purchaser, whose determination will be final and binding. The Purchaser reserves the absolute right to reject any or all tenders not in

---

**2.** Section 14(d)(6), 15 U.S.C. § 78n(d)(6), provides:

> Where any person makes a tender offer, or request or invitation for tenders, for less than all the outstanding equity securities of a class, and where a greater number of securities is deposited pursuant thereto within ten days after copies of the offer or request or invitation are first published or sent or given to security holders than such person is bound or willing to take up and pay for, the securities taken up shall be taken up as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor. The provisions of this subsection shall also apply to securities deposited within ten days after notice of an increase in the consideration offered to security holders, as described in paragraph (7), is first published or sent or given to security holders.

**3.** See *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir.1981) (securities laws action); *Marathon Oil Co. v. Mobil Corp.,* 669 F.2d 378 (6th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982) (antitrust action).

**4.** See *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 377–78.

proper form or the acceptance of or payment for which may, in the opinion of the Purchaser's counsel, be unlawful. The Purchaser also reserves the absolute right to waive any of the conditions of the Offer or any defect or irregularity in the tender of any Shares. None of the Purchaser, United States Steel, the Depositary, the Information Agent, the Dealer Managers or any other person will be under any duty to give notification of any defects or irregularities in tenders or incur any liability for failure to give any such information.

According to the complaint, the Second Supplement to Offer published December 14 stated that 51 million shares were tendered and delivered within the dates established for proration. U.S. Steel purchased 30 million shares from the tendered shares shortly after midnight on January 7, 1982. A January 8 press release stated that 54.2 million shares were in the pool selected from, while a January 11 release put the figure at 53,880,360. On January 11, three days after the actual purchase, shareholders received cash for 55.6% of the shares tendered.

According to the complaint, about 3 million shares that had not been tendered in compliance with the proration and delivery dates were included in the proration pool, thus reducing the proration factor from 58.8% to 55.6%. Plaintiff thus alleges that 3.2% of the shares entitled to proration should have been purchased but were not. Calculating the losses arising from U.S. Steel's failure to purchase this 3.2% of the properly tendered shares at $50 per share, Pryor alleges that the class of holders who had timely tendered lost $83 million plus interest from January 7, 1982.

The district court dismissed plaintiff's claim that expansion of the proration pool violated Section 14(d)(6). We affirm the dismissal of the claims against Bankers Trust but reverse the dismissal of the Section 14(d)(6) claim against U.S. Steel.

**5.** Rule 14d–8 now requires that all partial offers provide proration rights during the entire length

## DISCUSSION

### 1. *Section 14(d)(6)*

Section 14(d)(6) requires that offers for less than an entire class of equity securities be subject to a ten-day proration period. The district court rejected Pryor's Section 14(d)(6) claim on the grounds that the statute simply creates a mandatory minimum proration period and that an offeror might, after the proration, delivery, and expiration dates, extend the proration period. In its view, U.S. Steel's offer thus complied with Section 14(d)(6) and the extension of the proration period specified in the tender offer was actionable, if at all, only in a state law breach of contract action. 591 F.Supp. 949. The district court found support for its view, that the statute merely creates a mandatory minimum proration period, in two SEC Rules. Rule 14d–8,[5] 17 C.F.R. 240.14d–8, at the time of this offer exempted from Section 14(d)(6) offers that provided for proration periods of longer than ten days. Rule 14d–6(e)(vi), 17 C.F.R. 240.14d–6(e)(vi), required offerors to disclose in their offering materials their intentions with respect to proration. Since these rules contemplated proration periods of more than ten days, the district court reasoned, Section 14(d)(6) is implicated only in situations in which an offeror fails to provide the ten-day minimum period.

We disagree. We believe that by failing to enforce the ten-day deadline required by Section 14(d)(6) and provided in the offer, U.S. Steel failed to purchase shares on a pro rata basis and thereby violated the statute. Section 14(d)(6) has dual purposes: (i) it ensures that shareholders have time to consider a tender offer carefully and yet share in any control premium paid; and (ii) it deprives the offeror of any discretion to select among shareholders in paying the control premium.

The Supreme Court has noted that Section 14(d)(6) "was specifically designed to reduce pressures on target shareholders to deposit their shares hastily when the take-

of the offer. We express no view on the validity of this regulation.

over bidder makes its tender offer on a first-come, first-served basis." *Piper v. Chris-Craft Industries*, 430 U.S. 1, 23, 97 S.Ct. 926, 940, 51 L.Ed.2d 124 (1977). Prior to Section 14(d)(6), first-come, first-serve offers were often employed in two-step takeovers. Offerors placed a premium on shares amounting to a control bloc, and tender offers for less than 100% of a company's common stock were believed by Congress to confront shareholders with a difficult and time-pressured decision. Congress reasoned that shareholders might be tempted to tender without carefully weighing the offer so as to avoid missing out on a piece of the control premium. H.R.Rep. No. 1711, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 2811, 2812. Section 14(d)(6)'s mandatory minimum proration period thus affords shareholders a period of time in which to consider the offer and also to share in the control premium if a decision to tender is made. It is clear therefore that the ten day period is a mandatory minimum.

In addition, Section 14(d)(6) requires equal treatment of holders who tender within the proration period and thus has a non-discrimination component. Had U.S. Steel purchased a greater than pro rata share of timely-tendered shares from a particular shareholder, it would have violated Section 14(d)(6). This is evident not only in the very use of the term pro rata, but also in Section 14(d)(6)'s requirement that "an increase in the consideration offered to security holders" automatically extends the proration period for an additional ten days. For better or for worse, Congress desired to spread any premium for control among all shareholders tendering within the proration period. This purpose cannot be achieved unless offerors are forbidden to purchase a greater than pro rata share from particular holders.

█ It also follows that offerors are not free to extend the proration deadline after it has expired where the effect is to diminish the number of shares purchased from those who tendered before the deadline. It cannot be determined whether U.S. Steel

extended the proration period for the purpose of benefitting particular shareholders. However, the result of its increasing the size of the pool after expiration of the offer is the same as if it had. The discretionary power to extend selectively the proration date after the offer has been oversubscribed entails the power to alter the size and make-up of the proration pool, which in turn enables the offeror to favor certain holders to the detriment of others. Inclusion of shares that were not timely tendered obviously increases the amount purchased from late-tendering shareholders in the first step of the offer. Moreover, it allows an offeror to extend proration selectively so as to include particular shareholders the offeror may choose to favor. The cost of this discretionary, preferential treatment is, of course, borne not by the offeror but by those who have timely tendered their shares. The latter suffer from a reduced proration factor and a smaller share of the control premium.

Neither of the SEC regulations relied upon by the district court and in effect at the time of U.S. Steel's offer are inconsistent with our holding. The critical fact in the instant case is that U.S. Steel extended the proration period after the offer had been oversubscribed within the ten days specified by the offer and required by Section 14(d)(6), and after the proration deadlines had passed. The extension thus favored some shareholders at the expense of those who had tendered within the proration period. We need not, therefore, address the very different question of whether an offeror, when making the offer, may specify a proration period of longer than ten days. An offer that provides for a proration period of more than ten days does not, in and of itself, create a danger that an offeror may at its discretion select some shares for proration no matter when they were tendered. To the extent that the provision of the offer empowering U.S. Steel to determine the validity of a tender of shares or to waive the offer's conditions relating to tender purports to allow it to do what Section 14(d)(6) forbids, it is invalid.

### 2. Private Right of Action Under Section 14(d)(6)

■ Having dismissed Pryor's Section 14(d)(6) claim for failure to state a claim, the district court did not reach the question whether there is a private right of action under that section. Since we have reinstated that part of the complaint, we must decide whether Congress intended to provide such a cause of action. We conclude that it did.

Section 14(d)(6) makes no explicit mention of private enforcement. Therefore, we must determine "whether Congress intended to create ... by implication ... a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court identified four factors to be considered in deciding whether to imply a private right of action in the face of statutory silence. The Court has since refined that test by emphasizing indications, either explicit or implicit, of Congressional intent. One commentator has thus noted that "the Supreme Court [has] compressed the *Cort* test to a consideration solely of legislative intent," Note, *State Incorporation of Federal Law: A Response to the Demise of Implied Federal Rights of Action*, 94 Yale L.J. 1144, 1145 n. 6 (1985), and we have stated, "while [the *Cort*] factors remain relevant, the central inquiry must be whether Congress intended to create a private cause of action." *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 311 (2d Cir.1985). We view the *Cort* factors, therefore, as proxies for congressional intent.

The first *Cort* factor is whether the plaintiffs are "one of the class for whose *especial* benefit the statute was enacted." *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2088 (quoting *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916)). If so, it is likely that Congress intended that they might seek relief directly. Pryor and the class, as shareholders of a target company, are surely the primary intended beneficiaries of Section 14(d)(6), since "the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Piper v. Chris-Craft Industries*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977).

The second *Cort* factor, the one on which recent decisions have placed special emphasis, is whether there is any "indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088. The legislative history of Section 14(d)(6) is silent with regard to a private right of action. However, such silence is clearly not a *per se* bar to such a right since "[s]uch an intent may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979). *See also Cannon v. University of Chicago*, 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979). In *Touche Ross*, the Court refused to imply a private right of action against an accountant under Section 17(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q(a), a provision that requires record-keeping by members of national exchanges. However, "[t]he statute in *Touche Ross* by its terms neither granted private rights to the members of any identifiable class, nor proscribed any conduct as unlawful.... In those circumstances it was evident to the Court that no private remedy was available." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. at 24, 100 S.Ct. at 249. Section 14(d)(6), in contrast, identifies its beneficiaries and, unlike the bulk of federal securities regulation, confers a substantive right on those beneficiaries, namely, the right to have their shares purchased on a pro rata basis. Both the identification of beneficiaries and the substantive nature of the right created suggest that Congress intended to create a private right of action under Section 14(d)(6).

The third *Cort* factor is the importance of private enforcement to effectuating Congress' goal, it being reasonable to infer

that Congress intended such enforcement where it is the best way to secure the right created by the legislation. In our view, a private damage action is a most efficacious means of enforcing Section 14(d)(6). When an offeror violates the proration requirement, the injury is easy to calculate, the victims are easy to locate, and the likelihood of litigation by such victims is high if a private right of action exists. Private suits for damages are thus a most efficient means of compensating the injured parties and deterring future violations. To be sure, actions by the Securities and Exchange Commission are an alternative enforcement mechanism, but that agency must establish priorities according to its limited resources, and those priorities may well not weigh actions such as the present one highly.

The fourth and final factor under *Cort* is whether the cause of action is one "traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law[.]" *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2088. U.S. Steel argues that this case is governed by *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (fairness of merger terms irrelevant under Section 10(b) where there is full disclosure). *Santa Fe* is wholly inapposite, however. It involved the question of whether to create federal substantive rights in the face of congressional silence. In contrast, the issue before us is whether Congress intended that certain enforcement rights attend a substantive right established by Congress. In rejecting the contention that Section 10(b) and/or SEC Rule 10b–5 created a federal law of fiduciary duties, the *Santa Fe* court stated: "Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." *Id.* at 479, 97 S.Ct. at 1304. Here, however, U.S. Steel is alleged to have violated a specific substantive provision of the Williams Act by failing to purchase shares on a pro rata basis. Under these circumstances, we are not intruding unnecessarily into the province of state contract law by recognizing a federal private remedy to enforce a requirement of a federal statute.

### 3. *Claims Against Bankers Trust*

Since neither Section 14(d)(6) nor Rule 10b–13 imposes any duties on a depositary, we affirm the district court's dismissal of Pryor's claims against Bankers Trust.

\* \* \* \* \* \*

The judgment of the district court is affirmed in part and reversed in part.

LUMBARD, Circuit Judge, concurring and dissenting:

I agree that plaintiff has failed to state a cause of action against Bankers Trust, the depository for the tendered stocks. I disagree, however, with the majority's holding that plaintiff has stated a claim against the tender offeror, U.S. Steel.

Plaintiff alleges that U.S. Steel accepted into the proration pool approximately three million Marathon shares that had not been tendered within the 10-day proration period established by § 14(d)(6) of the Williams Act, 15 U.S.C. § 78n(d)(6), and/or delivered in accordance with the terms of the offer. Plaintiff argues that because U.S. Steel was determined to purchase only a fixed total number of shares—thirty million—its acceptance of the late tendered shares necessarily resulted in watering down the percentage of shares taken from each timely tendering shareholder. Plaintiff maintains, and the majority accepts, that U.S. Steel's alleged conduct states a cause of action under § 14(d)(6) because this provision grants the right to have shares accepted only to those shareholders who tender within the 10-day proration period. I believe that the majority has misinterpreted § 14(d)(6).

§ 14(d)(6) is designed to eliminate the pressure on shareholders to respond to a

tender offer immediately, out of fear that they will be shut out if the offer becomes oversubscribed. This is done by requiring the tender offeror to accept shares tendered within the first ten days of the offer and to buy a pro rata percentage of each tendering shareholder's shares if the offer does in fact become oversubscribed in that time. Shareholders are thus accorded an opportunity to reflect on the merits of the bid without risking their chance to participate in the offer.

U.S. Steel's alleged acceptance of late-tendered shares for proration did not interfere with these goals. U.S. Steel simply allowed more shareholders to participate in the bid than would otherwise have been able to had it been strict about the 10-day deadline. There is no indication that such conduct is actionable under § 14(d)(6) and I see no good reason why it should be. Indeed, SEC Rules 14d–8 (17 C.F.R. § 240.-14d–8) and 14d–6(e)(vi) (17 C.F.R. § 240.-14d–6(e)(vi)) in force at the time of U.S. Steel's offer, stated that the proration deadline was left to the terms of the tender offer, so long as it met the 10-day statutory minimum. The SEC's interpretation of § 14(d)(6) suggests that enforcement of the proration deadline is a matter of contract law, not a matter cognizable under federal securities law.[1]

As the majority points out, § 14(d)(6) also has a non-discrimination component that prohibits an offeror from treating tendering shareholders unequally. I do not believe, however, that U.S. Steel discriminated among shareholders in a way that violated that section. During the legislative debates over the Williams Act, then SEC Chairman Cohen expressed concern over using 10 days as a minimum proration period because he felt that the tender offeror would favor sophisticated investors by waiting until the eleventh day in order to buy up *all* their shares rather than just a percentage. *See Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearings on S. 510 before the Subcomm. on Securities of the Senate Comm. on Banking and Currency,* 90th Cong., 1st Sess. 187 (1967). In response to Chairman Cohen's concerns, proponents of the 10-day rule emphasized that a tender offeror would not be permitted to accept more shares than were originally sought without first accepting all the shares tendered within the proration period. *See id.* at 245–46 (letter of Gordon L. Calvert, general counsel, Investment Bankers Association of America).

In this case, U.S. Steel has not purchased any more shares than it had originally sought. Plaintiff is not complaining that U.S. Steel bought additional *non-prorated* shares, but that U.S. Steel allowed late shares *to be prorated.* I believe that the distinction is important because in the former case, the tender offeror treats tendering shareholders unequally: some shareholders have their shares prorated while others get all their shares taken up. In the latter case, which is the case at bar, all tendering shareholders are treated equally: everyone's shares are prorated.

Moreover, in this latter case, there should be little concern that the tender offeror will favor one group of shareholders over another. Because the tender offeror is committed to accepting a fixed number of shares, it gains nothing from allowing late tendering shareholders into the proration pool. Indeed, it is usually in the tender offeror's best interest to close the proration pool as quickly as possible in a hostile takeover battle against target management or a competing tender offeror.[2]

---

1. The SEC has subsequently revised Rule 14d–8 to *require* the tender offeror to extend the proration period for the entire duration of the offer. The SEC's rationale for the revised rule is that the 10-day proration period of § 14(d)(6) is too short to give target shareholders time to evaluate critically the terms of a tender offer. As the majority states, we express no view on the validity of this Rule.

2. This explains, in part, why Congress adopted a short mandatory proration period of 10 days. When the Williams Act was first under consideration, the SEC endorsed a Senate bill which would have made the proration period co-extensive with the entire length of the offer. This suggestion was rejected in favor of the 10-day proration period used by the New York Stock

One plausible explanation of why a tender offeror might wish to accept late tendered shares for proration is that it hopes to avoid complaints from and possible lawsuits brought by the late tenderers. I imagine that whenever a tender offeror fixes the proration date there will be shareholders who straggle in late because of the mails, excusable neglect, or other reasons.[3] By accommodating these shareholders, the tender offeror has liberally construed the precise terms of the offer, but I see little reason why this is of federal concern.

This is not to say that U.S. Steel is necessarily free from any liability. The Marathon shareholders who tendered on time are harmed if U.S. Steel did in fact include late-tendered shares in the proration pool because fewer of their shares were taken up. I do not believe, however, that U.S. Steel's actions violated § 14(d)(6). If anything, its actions promoted the purposes of that section by allowing more shareholders to participate in the bid and by treating all tendering shareholders equally. If timely tendering shareholders are entitled to a preference over those who tender late, the entitlement derives from the terms of the tender offer and state contract law, not from § 14(d)(6).

I would also affirm the dismissal of the plaintiff's claim under SEC Rule 10b–13, 17 C.F.R. § 240.10b–13, which prohibits a tender offeror from making any purchases otherwise than pursuant to the offer while the offer is in effect. Plaintiff contends that by including late-tendered shares in the proration pool, U.S. Steel purchased those shares "otherwise than pursuant to" the offer. I disagree.

The purpose of the Rule is to prevent a tender offeror from making "outside" purchases on different terms, especially different price terms, from those offered to shareholders who have already tendered. But, as Judge Lowe noted, plaintiff's complaint is very different. "Plaintiff is not really claiming that purchases from the late-tendering shareholders were made outside of the tender offer, but rather that the late-tendering shareholders were wrongfully allowed to *participate* in the offer as if they had made a valid tender.'" *Pryor v. United States Steel Corp.*, 591 F.Supp. 942, 961 (S.D.N.Y.1984) (emphasis in original).

Because I would hold that U.S. Steel's actions did not violate § 14(d)(6) or Rule 10b–13, I would not reach the question of an implied damage remedy.

Exchange because if pro rata acceptance were made mandatory for the entire period of the offer, it would allow shareholders to delay their decision to tender and give target management an unfair time advantage in a takeover battle. Congress believed that the 10-day rule both provided sufficient time for shareholders to assess the merits of a tender offer and recognized the tender offeror's desire to move quickly. *See* S.Rep. No. 550, 90th Cong., 1st Sess. 4–5 (1967).

**3.** Judge Lowe hypothesized that this is what happened in the U.S. Steel offer:

The facts in this case are illustrative. The December 8th press release announced that about 54 million shares of Marathon stock had been *tendered.* The intermediate press announcements stated that approximately 51 million shares had been *perfected.* The final number of shares accepted for proration was close to the 54 million figure. One possible interpretation of these facts is that U.S. Steel accepted several million shares for proration, with respect to which tender had been *attempted* but not *perfected* by the proration date ("perfection" meaning the completion of a check on the validity of each share's certificate and the matching of certificate against prior guarantees of delivery). Under plaintiff's proposed construction of § 14(d)(6), defendant's acceptance of these shares would presumably constitute a violation of the securities law, solely because the tender of these shares was technically deficient.

*Pryor v. United States Steel Corp.*, 591 F.Supp. 942, 950 n. 10 (S.D.N.Y.1984) (emphasis in original).