Florence **MURRAY,** et al.

v.

**HOSPITAL CORPORATION OF AMERICA,** et al.

No. 3–87–0736.

United States District Court, M.D. Tennessee, Nashville Division.

March 18, 1988.

Dennis E. Murray, Murray & Murray, Sandusky, John T. Murray, Sandusky, Ohio, for plaintiffs.

Walter H. Crouch, Ames Davis, Waller, Lansden, Dortch & Davis, Nashville, Tenn., Jeremy Berman, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants.

## MEMORANDUM

WISEMAN, Chief Judge.

Plaintiffs Florence and Margaret M. Murray (Murrays), present shareholders of defendant Hospital Corporation of America (HCA), and Murray & Murray Co., L.P.A., Profit–Sharing Plan & Trust and Murray & Murray Co., L.P.A., Pension Plan & Trust (Plans), two former shareholders of HCA, initiated this federal securities action against HCA and all but one of its current directors in May, 1987.[1] In their Second

---

1. Plaintiffs' original and first amended complaint were filed in the United States District Court for the Northern District of Ohio. In September, 1987, the district court transferred this action to the Middle District of Tennessee at defendants' request.

Amended Complaint, plaintiffs seek $1.5 billion in compensatory damages and an additional $1 billion in punitive damages for alleged violations of sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b) and 78n(a) (1981), and SEC Rules 10b–5 and 14a–9, 17 C.F.R. §§ 240.10b–5 and 240.14a–9. Plaintiffs also alleged that the individual defendants breached fiduciary duties imposed under state law.

In late October, 1987, the Murrays filed a supplemental complaint, pursuant to Fed.R. Civ.P. 15(d), in which they alleged violations of section 13(e)(1) of the Exchange Act, 15 U.S.C. § 78m(e)(1) (1981), and SEC Rule 13e–4(f)(3), 17 C.F.R. § 240.13e–4(f)(3). The Murrays' supplemental complaint also alleged additional breaches of fiduciary duties as well as breaches of contractual duties of good faith and fair dealing.[2]

Several dispositive motions are presently pending before the Court. Defendants have moved to dismiss both plaintiffs' Second Amended Complaint and the Murrays' supplemental complaint for failing to state a claim upon which relief can be granted. In addition, both plaintiffs and defendants have moved for partial summary judgment on the Murrays' supplemental complaint. As noted in this Court's February 11, 1988 Order denying defendants' motion for reconsideration, the Court has decided to rule on these substantive motions before determining whether plaintiffs are entitled to maintain this lawsuit as a class action.

## I. *Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint*

### A. Section 10(b)/Rule 10b–5 Claims

#### 1. *Overview*

Although plaintiffs' Second Amended Complaint is somewhat confusing, it appears that plaintiffs' section 10(b)/Rule 10b–5 claims are based exclusively upon allegations of insider trading by HCA. Specifically, plaintiffs allege that HCA ac-

tively purchased shares of its own common stock during the months of December, 1986 and January, 1987 while in possession of material nonpublic information concerning HCA's then proposed sale of 104 of its general, acute care hospitals and related facilities to Health Trust, Inc.—The Hospital Company; a newly formed company owned primarily by an Employee Stock Ownership Plan and managed by former HCA directors and officers (Reorganization). *See* Second Amended Complaint at ¶ 10. Plaintiffs complain that this proposed Reorganization was carefully and intentionally designed to benefit HCA management at the expense of other HCA shareholders.

#### 2. *Legal Discussion*

Section 10(b) of the Exchange Act makes it unlawful for any person, either directly or indirectly, "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 was promulgated and adopted by the SEC pursuant to the rulemaking authority conferred upon it by section 10(b). It provides in relevant part:

> It shall be unlawful for any person, directly or indirectly ... (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The shared purpose of section 10(b) and Rule 10b–5 is "to protect the investing public and to secure fair dealing in the securities markets by promoting full disclosure of [material] information." *Shapiro v. Merrill Lynch,*

---

**2.** Both the Second Amended Complaint and the Murrays' Supplemental Complaint were brought as class actions.

*Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 235 (2d Cir.1974). Section 10(b) and Rule 10b–5, however, were not intended to be insurance policies for imprudent investors.

■ It is well established that "in order to assert a claim for damages based on a violation of [section 10(b) or Rule 10b–5], the plaintiff must be either a purchaser or seller of securities in connection with the securities claims." *Gaff v. Federal Deposit Ins. Corp.,* 814 F.2d 311, 318 (6th Cir. 1987) (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 749, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539, 557 (1975)). This standing requirement is designed to prohibit "persons who claim inaction in reliance on fraudulent [activity]" from bringing section 10(b) and Rule 10b–5 claims. *See Marsh v. Armada Corp.,* 533 F.2d 978, 980 (6th Cir.1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977). To permit such claims would be to "open the door to vexatious and meritless lawsuits by persons who never owned stock but who comb the financial pages for possible inaccuracies which could support colorable claims with significant settlement value." *Id.* Because the Murrays have failed to allege that they either purchased or sold HCA stock during the relevant period of nondisclosure identified in the Second Amended Complaint, they lack standing to pursue their section 10(b)/Rule 10b–5 claims. Accordingly, their claims must be dismissed.

■ Unlike the Murrays, however, the Plans have alleged that they sold HCA securities during the relevant period of nondisclosure, and that they would not have done so had they been aware of HCA's then proposed Reorganization. *See* Second Amended Complaint at ¶ 2. The Plans, therefore, have standing to pursue their section 10(b)/Rule 10b–5 claims, and

have sufficiently plead actual reliance on HCA's material omissions.[3] Nevertheless, the Plans' section 10(b)/Rule 10b–5 claims must be dismissed for failing to allege "loss causation"—a distinct element of a section 10(b)/Rule 10b–5 violation.

To recover damages under section 10(b) and Rule 10b–5, a plaintiff must establish that the material misrepresentation or omission about which they complain caused the injuries they claim to have suffered. *See Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 313 (2d Cir.1985). In order to establish this requisite causation, the plaintiff must show not only reliance or "transaction causation"—that they relied on the alleged material misrepresentation or omission in making an investment decision—but also "loss causation"—that the misrepresentation or omission "was in some reasonably direct or proximate way responsible for [their pecuniary] loss." *Campbell v. Shearson/American Express, Inc.,* 829 F.2d 38 (6th Cir.1987). *See also Bennett,* 770 F.2d at 313; *Fryling v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 593 F.2d 736, 743–44 (6th Cir.1979) (recognizing "loss causation" as a separate element of section 10(b)/Rule 10b–5 claim). This "loss causation" requirement is satisfied only if the alleged misrepresentation or omission "touches upon" the reasons for a particular investment's increase or decrease in value. *See Campbell, supra.* As the Sixth Circuit recently noted in *Campbell,* without such a requirement, section 10(b) and Rule 10b–5 "would become an insurance plan for the cost of every security purchased [or sold] in reliance upon a material misstatement or omission." *Id.*

In their Second Amended Complaint, the Plans alleged that *HCA's then proposed Reorganization* would result in damages

---

**3.** In section 10(b)/Rule 10b–5 material omission cases, proof of actual reliance is unnecessary. In such cases, reliance may be established by showing: (1) that the defendant(s) had a duty to disclose the information withheld, and (2) that a reasonable investor might have considered the information important in making his or her investment decision. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 154–

55, 92 S.Ct. 1456, 1472–73, 31 L.Ed.2d 741, 761–62 (1972). *But see Fridrich v. Bradford,* 542 F.2d 307, 318–19 (6th Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977) (limiting *Affiliated Ute* to cases in which the duty to disclose is absolute—where plaintiff has dealt with defendant or been influenced in his or her investment decisions by acts of the defendant).

to them in an amount not less than nineteen dollars per share. Nowhere in their complaint, however, did the Plans allege any direct or proximate relationship between this claimed pecuniary loss and HCA's alleged insider trading or material omissions. In fact, the Plans did not claim that HCA's alleged insider trading had any impact whatsoever upon the value of HCA stock. Given that the Plans allegedly *sold* HCA securities during the relevant period of nondisclosure, in order to demonstrate that they have been damaged by HCA's alleged omission, the Plans must show that by failing to disclose the material information in question, HCA distorted the price of its own securities in a *downward* fashion. Only then would the Plans have suffered pecuniary damage as a result of *selling* their HCA holdings.

█ In an attempt to cure this defect, the Plans argue that the "fraud-on-the-market" theory relieves them of any obligation they may have had to plead "loss causation." The Plans' reliance on the "fraud-on-the-market" theory, however, is misplaced. The "fraud-on-the-market" theory "allows a plaintiff to rely on the integrity of the market rather than requiring direct reliance on the defendant's conduct." *In re Texas International Securities Litigation*, 114 F.R.D. 33, 41 (W.D.Okla.1987). The theory "has been consistently applied in cases in which the defendants made public, material misrepresentations [4] and the plaintiffs transacted shares in an impersonal, efficient market," *Levinson v. Basic, Inc.*, 786 F.2d 741, 751 (6th Cir.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 1284, 94 L.Ed.2d 142 (1987), as an alternative means of establishing reliance or "transaction causation." *See Nelsen v. Craig–Hallum, Inc.*, 659 F.Supp. 480, 484 n. 3 (D.Minn. 1987); *Levinson*, 786 F.2d at 750 (applied in situations "where proof of actual reliance would be impractical or impossible"). The theory, however, has not and may not

be used, as the Plans here suggest, as a means of pleading and proving "loss causation." Consequently, the Plans' section 10(b)/Rule 10b–5 claims must also be dismissed.

### B. *Section 14(a)/Rule 14a–9 Claims*

#### 1. *Overview*

In their Second Amended Complaint, plaintiffs allege that defendants violated section 14(a) and Rule 14a–9 by omitting material information—the fact that HCA's then proposed Reorganization was forthcoming—from a proxy statement issued by defendants on March 6, 1987. The proxy statement was mailed to all record holders of HCA common stock in connection with a proxy solicitation for use at HCA's then upcoming April 17, 1987 shareholders meeting. The proxy statement concerned three matters: (1) the election of directors; (2) the approval of proposed auditors; and (3) the adoption of a shareholder proposal. If it had been adopted, the shareholder proposal would have required HCA's Board of Directors to "redeem or submit for shareholder approval" a Shareholder Rights Plan adopted by the Board on February 14, 1986.[5] According to the proponents of the shareholder proposal, the Rights Plan significantly deterred nonnegotiated takeovers and served to entrench current HCA management. The Board, on the other hand, argued that the Rights Plan was designed to protect the interests of all shareholders by deterring anyone from purchasing a controlling interest in HCA without paying a premium for control or making a fair offer for all outstanding shares.

#### 2. *Legal Discussion*

Section 14(a) of the Exchange Act makes it unlawful for any person to use certain jurisdictional means to solicit proxies "in contravention of such rules and regulations

---

4. Given certain *dicta* in *Levinson*, it is not altogether clear whether the "fraud-on-the-market" theory applies to cases involving insider trading and material omissions. *See Levinson*, 786 F.2d at 751 (distinguishing *Fridrich, supra* at n. 3). As the *Levinson* court noted, in such cases there

is no way that the defendants' wrongful acts can affect market price. *Id.*

5. It is important to note that HCA's Board did not need shareholder approval, under Tennessee law, to adopt this Shareholder Rights Plan.

as the [SEC] may prescribe." 15 U.S.C. § 78n(a) (1981). Rule 14a–9, which was promulgated by the SEC pursuant to section 14(a), provides in relevant part:

No solicitation subject to this regulation shall be made by means of any proxy statement ... which omits to state any material fact necessary in order to make the statements therein not false or misleading.

17 C.F.R. § 240.14a–9. The primary purpose of section 14(a) is "to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed. 2d 423, 427 (1964). More specifically, section 14(a) was intended to "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which ... [had] frustrated the free exercise of the voting rights of stockholders." H.R.Rep. No. 1383, 73rd Cong., 2d Sess., 14.

■ In their motion to dismiss, defendants contend that the Plans lack standing to sue under section 14(a) because they were not HCA shareholders at the time of the alleged proxy violations. Given that the underlying purpose of section 14(a) is to protect and preserve "fair corporate suffrage" by providing for full and fair disclosure in corporate elections, and that the injury suffered as a result of a violation of section 14(a) "ordinarily flows from the damage done to the corporation," *Borak*, 377 U.S. at 432, 84 S.Ct. at 1560, 12 L.Ed.2d at 427, the Court agrees that plaintiffs who are not shareholders with voting rights at the time of the alleged proxy violation lack standing to pursue claims under section 14(a) and Rule 14a–9. *See Smillie v. Park Chemical Co.*, 466 F.Supp. 572, 575 (E.D. Mich.1979); *Wulc v. Gulf & Western Ind., Inc.*, 400 F.Supp. 99, 103–04 (E.D.Pa.1975). *Cf. Dann v. Studebaker–Packard Corp.*, 288 F.2d 201, 209–10 (6th Cir.1961) (plaintiffs have standing even though they do not allege that they granted proxies in reliance on deceptive or false proxy material). Because the Plans completely divested themselves of HCA common stock on January 27, 1987, more than a month before defendants issued the proxy statement in question, the Plans could not have been affected by the alleged proxy violations. *See Ferber v. Morgan Stanley Co.*, 1983–84 Fed.Sec.L.Rep. (CCH) ¶ 99,364 at 97,504 (E.D.Pa. Jan. 9, 1984). The Plans' section 14(a)/Rule 14a–9 claims, therefore, must be dismissed.

The Murrays, unlike the Plans, owned shares of HCA common stock at the time of the alleged proxy violations and, therefore, have standing to pursue their section 14(a)/Rule 14a–9 claims. Defendants contend, however, that the Murrays' claims must nevertheless be dismissed for failing to allege "transaction causation." In *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Supreme Court held:

Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if ... he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction [*for which approval is sought and about which the shareholder complains*].

396 U.S. at 385, 90 S.Ct. 622, 24 L.Ed.2d at 602 (emphasis added). This requisite causal connection or "transaction causation" is established where the "harm to the plaintiffs ... [results] from the corporate transaction they authorized as a result of the false or misleading proxy solicitation." *In re Tenneco Securities Litigation*, 449 F.Supp. 528, 531 (S.D.Tex.1978), *quoted with approval in, Gaines v. Haughton*, 645 F.2d 761, 776 (9th Cir.1981), *cert. denied*, 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982); *Leff v. CIP Corp.*, 540 F.Supp. 857, 866 (S.D.Ohio 1982). *See also In re General Tire & Rubber Co. Securities Litigation*, 726 F.2d 1075, 1082 (6th Cir.1984) (requiring showing of causal link between challenged activity and the proxy process). In other words, "[i]n order to recover damages under [section] 14(a) the

proxy violation must have caused the economic harm alleged." *Tenneco,* 449 F.Supp. at 531.

■ In the present case, the Murrays allege that they have suffered economic loss as a result of HCA's Reorganization. *See* Second Amended Complaint at ¶ 14. The Murrays, however, do not allege that they have suffered any economic harm as a result of any of the "transactions" authorized by the allegedly deceptive proxy solicitation. In short, the Murrays have failed to establish the necessary causal nexus between the underlying challenged activity— HCA's Reorganization—and the proxy process. The Murrays' section 14(a)/Rule 14a–9 claims, therefore, must also be dismissed.[6]

## II. *The Murrays' Supplemental Complaint*

### A. *Factual Background* [7]

On September 21, 1987, approximately four months after this lawsuit was originally filed, HCA initiated what is commonly referred to as a "Dutch Auction" tender offer in which it offered to purchase 12 million shares of its own common stock (Tender Offer). Pursuant to the Tender Offer, HCA invited its shareholders to tender all or part of their shares at a price no greater than $51 nor less than $47 per share. Upon expiration of the Tender Offer, HCA would select a single per share purchase price within that range which

would enable it to purchase 12 million shares. Just prior to the commencement of the Tender Offer, the price of HCA common stock on the New York Stock Exchange was $45¼ per share.

According to HCA, the Tender Offer was part of an "ongoing repositioning and reorganization," the purpose of which was "to improve [HCA's] financial strength and enhance values for [HCA] shareholders." [8] *See* Offer to Purchase at ¶ 8. Neither HCA nor its Board of Directors, however, made any recommendation to any HCA shareholder to tender or refrain from tendering any or all of his or her shares. *Id.* Furthermore, HCA informed its shareholders that it had been advised that none of its directors or executive officers intended to tender their shares pursuant to the offer.[9] *Id.*

The Tender Offer was originally scheduled to expire at midnight, New York City time, October 19, 1987. In the Offer to Purchase, however, HCA expressly reserved the right "at any time and from time to time, to extend the period during which the Offer is open." Offer to Purchase, ¶ 15 at 22. The Offer to Purchase further provided that "in the event of oversubscription ... Shares tendered prior to the Expiration Date [would] be eligible for proration." *Id.,* ¶ 1 at 2. The term "Expiration Date" was defined in the Offer to Purchase to mean "12:00 Midnight, New York City time, on October 19, 1987, *unless*

---

**6.** As noted at the outset of this opinion, plaintiffs' Second Amended Complaint also alleges violations of state law. Plaintiffs' state-law claims, however, are before the Court solely on the basis of this Court's pendent jurisdiction. Because plaintiffs' federal securities law claims have been dismissed in their entirety at this early stage in the proceedings, the Court declines to exercise jurisdiction over these state-law claims. *See Carnegie–Mellon University v. Cohill,* 484 U.S. ——, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720, 730 n. 7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine ... will point toward declining to exercise jurisdiction over the remaining state-law claims").

**7.** The following factual statement is undisputed by the parties.

**8.** This type of repositioning and reorganization is commonly referred to as a "leveraged recapitalization." The primary purpose of a "leveraged recapitalization" is to "maximize shareholder value" by providing shareholders "with an opportunity to receive substantial cash value on a current basis while continuing as significant equity investors in the corporation as an independent public entity." Fogg, *Leveraged Recaps: Maximizing Shareholder Value,* Nat'l L.J., Feb. 8, 1988, at 24, col. 1.

**9.** In its Offer to Purchase, HCA represented that as of September 15, 1987, its directors and officers beneficially owned approximately 2.8 percent of HCA's outstanding shares. HCA estimated that its directors and officers would beneficially own 3.3 percent of all outstanding shares after the Tender Offer was completed. *See* Offer to Purchase, ¶ 8 at 10.

*and until* [HCA], in its sole discretion, shall have extended the period of time during which the Offer is open, in which event the term ... shall refer to the latest time and date at which the Offer, as so extended ..., shall expire." *Id.*

On October 14, 1987, HCA extended the Tender Offer and consequently the proration period [10] until October 22, 1987. HCA's stated purpose for doing so was to provide its shareholders with an opportunity to review newly released *pro forma* financial statements.[11] On October 15, 1987, supplemental plaintiffs Florence and Margaret M. Murray tendered shares pursuant to the Tender Offer. On that same day, the Murrays each purchased an additional 100 shares of HCA common stock at $41 375/1000 per share, allegedly in reliance upon the terms of the Tender Offer.

In a news release dated October 20, 1987, HCA announced that the executive committee of its Board of Directors authorized HCA to extend the Tender Offer to November 19, 1987.[12] According to Thomas F. Frist, Jr., HCA's Chairman and Chief Executive Officer, the Tender Offer was extended "to allow HCA and its [Board] time to assess current market and business conditions and prospects in light of the unforeseen developments that ... occurred since the Offer began." *See* October 20, 1987 News Release. The "unforeseen development" to which Frist referred was a massive decline in stock prices in both the international and domestic markets. Between the opening of trading on October 15, 1987 and the close of trading on October 19, 1987, the price of HCA stock plummeted from $41⅜ to $25⅝.

On November 3, 1987, HCA issued another news release in which it announced that

it intended to extend the Tender Offer and proration period a third time, this time to January 4, 1988.[13] For the first time, HCA and its Board of Directors recommended that all HCA shareholders consider tendering their shares at $47 per share, "subject to investment goals and subject to the market price of HCA stock remaining significantly below $47 per share." November 3, 1987 News Release at 1–2. According to HCA, the Tender Offer was extended "to ensure that all shareholders have sufficient time to carefully study the revised tender offer materials, including the new HCA and Board recommendation, and to review their individual tax and other financial consequences." *Id.* at 3. On November 5, 1987, HCA disseminated an explanatory letter and a Supplement to its Offer to Purchase to all HCA shareholders. In the explanatory letter, HCA disclosed that it had been advised that its directors and executive officers intended to tender a "substantial portion" of their approximately two million shares.

The Tender Offer closed on January 4, 1988. At the time of closing, a total of 75,039,214 shares of HCA common stock had been tendered at $47 per share. In accordance with the terms of the Tender Offer, HCA purchased 217,794 shares from "odd lot holders" and an additional 11,782,206 shares on a *pro rata* basis. On January 4, 1988, the market price of HCA common stock closed at $32¾ per share.

### B. *Section 13(e)(1)/Rule 13e-4(f)(3)* [14]

#### 1. *Overview*

Both the Murrays and defendants have moved for summary judgment on the Mur-

---

**10.** Rule 13e–4(f)(3) requires that the proration deadline be identical to the expiration date.

**11.** The Murrays do not contest the legality of this original extension apparently because the Tender Offer was not oversubscribed at the time.

**12.** At the time HCA extended the offer, approximately 23 million shares of stock had already been tendered, 14 million of which were tendered at $47 per share. This second extension, therefore, was made at a time when the Tender

Offer was already oversubscribed at a price of $47 per share.

**13.** On the last full trading day prior to this announcement, the price of HCA stock was $30⅜ per share.

**14.** To the extent that the Murrays' supplemental complaint alleges that defendants violated section 13(e)(1) or Rule 13e–4 by contemplating termination of the Tender Offer, it must be dismissed as moot. As indicated by the above factual discussion, HCA did not terminate the

rays' section 13(e)(1)/Rule 13e–4(f)(3) claim. In their motion, the Murrays argue that defendants, on two separate occasions, violated section 13(e)(1) of the Exchange Act and SEC Rule 13e–4(f)(3) by extending the proration/expiration date of HCA's Tender Offer at a time when the Tender Offer was fully subscribed at $47 per share. The Murrays contend that by selectively extending the proration/expiration date of HCA's already oversubscribed Tender Offer, defendants illegally altered the size and make-up of the proration pool and thereby favored certain shareholders at the expense of others. Defendants, on the other hand, argue that neither section 13(e)(1) nor Rule 13e–4(f)(3) prohibit such extensions.

### 2. *Legal Discussion*

Section 13(e)(1) was enacted by Congress in 1968 as part of the Williams Act amendments to the Exchange Act. The fundamental purpose of the Williams Act amendments was to protect investors by requiring full and fair disclosure of information in connection with "the purchase, by direct acquisition or by tender offers, of substantial blocks of the securities of publicly held companies." 113 *Cong. Rec.* 24,664 (1967) (statement by Senator Williams, the sponsor of the amendments). Rule 13e–4 was promulgated by the SEC, pursuant to the authority conferred upon it by section 13(e)(1), to regulate tender offers made *by issuers* for the purchase of their own securities. Subsection (f)(3) of Rule 13e–4 provides:

> If the issuer or affiliate makes a tender offer for less than all of the outstanding equity securities of a class, and if a greater number of the securities is tendered pursuant thereto than the issuer ... is bound or willing to take up and pay for, ... [the issuer must accept, on a *pro rata* basis, securities tendered] *during the period such offer remains open....*

17 C.F.R. § 240.13e–4(f)(3) (1987) (emphasis added). The primary purpose of subsection (f)(3)'s *pro rata* acceptance requirement is

to afford *all* security holders *who tender their shares within the proration period* an equal and fair opportunity to consider and participate in the tender offer. *See* Exchange Act Release No. 10,842 [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,182 (August 16, 1979) (Rule 13e–4(f)(3), like section 14(d)(6) of the Exchange Act, was designed "to allow all security holders an opportunity to participate.").

Neither section 13(e)(1) nor Rule 13e–4 prohibit a bidder in a partial issuer tender offer from expressly reserving the right to extend the proration/expiration date of the offer. As defendants correctly note, the bidder, "as the master of his offer, has wide latitude over [the] terms of the offer ... [and] may impose as many conditions or terms as he may choose." *Brill v. Burlington Northern, Inc.*, 590 F.Supp. 893, 898 (D.Del.1984). *See also Indiana National Bank v. Mobil Oil Corp.*, 578 F.2d 180, 185 (7th Cir.1978); *Newmont Mining Corp. v. Pickens*, 831 F.2d 1448, 1450 (9th Cir.1987) (Williams Act "not intended to impose substantive restrictions on the actual terms of tender offers"). Tender offer materials, therefore, "typically contain various reservations of rights whereby the bidder reserves the right to, among other things, *extend* or terminate the offer, ... or otherwise alter terms." Exchange Act Release No. 24,296, 52 Fed.Reg. 11,458 at 11,460 (1987) (emphasis added). *See also Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids, Hearings on S. 510 Before the Subcomm. on Securities of the Sen. Comm. on Banking and Currency*, 90th Cong., 1st Sess. 17 (1967) (statement of Manuel F. Cohen, Chairman of the SEC). According to the SEC, "such reservations are an acceptable means of permitting the bidder to take action varying the terms of an offer, *so long as the action taken would not contravene the Williams Act or rules.*" Exchange Act Release No. 10,842 [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,182 (emphasis added).

offer as the Murrays' predicted in their supple-    mental complaint.

In the present case, it is undisputed that HCA expressly reserved the right to extend the proration/expiration date of its Tender Offer "at any time and from time to time" in its sole discretion. The dispositive question presented by the parties' cross motions for summary judgment on this claim, therefore, is whether section 13(e)(1) or Rule 13e–4(f)(3) prohibits a bidder in a partial issuer tender offer from extending an already oversubscribed offer. For the reasons set forth below, the Court holds that they do not and, therefore, grants defendants' motion for summary judgment on this claim.

As noted earlier, Rule 13e–4(f)(3) provides that in the event that a partial issuer tender offer is oversubscribed, the bidder must accept shares tendered throughout the period the tender offer remains open on a *pro rata* basis. Nothing in the express language of either section 13(e)(1) or Rule 13e–4, however, prohibits a bidder from extending the proration/expiration date of an oversubscribed offer in accordance with the express terms of the offer. In fact, to the extent that Rule 13e–4(d)(1)(i) requires bidders to disclose "[t]he scheduled termination date of the issuer tender offer *and whether it may be extended*" without making any exception for oversubscribed offers, Rule 13e–4 implicitly contemplates such extensions. 17 C.F.R. § 240.13e–4(d)(1)(i) (emphasis added). Furthermore, the SEC recently has interpreted Rule 13e–4 to *require* extensions of the proration/expiration date of issuer tender offers where new material information is disclosed "at or near the end of the period when the offer was originally set to expire." *Newmont Mining,* 831 F.2d at 1452 (quoting the SEC's Amicus Curiae Brief in that case). *See also* Exchange Act Release No. 24,296, 52 Fed.Reg. 11,458 at 11,459 (1987). Like Rule 13e–4(d)(1)(i), this recent SEC interpretation was not made subject to any exception for oversubscribed offers.

Apparently recognizing that their position lacks any express statutory or regulatory support, the Murrays urge this Court to add a judicially created gloss to section 13(e)(1) and Rule 13e–4. More specifically, the Murrays argue that this Court should interpret Rule 13e–4(f)(3) expansively to prohibit extensions of already oversubscribed issuer tender offers. In support of their argument, the Murrays rely exclusively on *Pryor v. United States Steel Corp.,* 794 F.2d 52 (2d Cir.1986).

In *Pryor* the United States Court of Appeals for the Second Circuit held that section 14(d)(6) of the Exchange Act [15] prohibits a bidder in a partial third-party tender offer from permitting shareholders to tender shares *after the offer has become oversubscribed and the proration deadline has passed. Pryor,* 794 F.2d at 55. According to the *Pryor* court, section 14(d)(6)'s *pro rata* acceptance requirement reflects a congressional desire to treat all shareholders *who tender within the proration period* equally, and to spread any control premium paid by the bidder among those same shareholders. *Id.* at 56. Consequently, the *Pryor* court concluded that "offerors are not free to extend the proration deadline *after it has expired* where the effect is to diminish the number of shares purchased from those who tendered before the deadline." *Id.* (emphasis added). To hold otherwise would be to contravene the congressional desire reflected in section 14(d)(6).

A careful reading of the Second Circuit's decision in *Pryor* reveals that the Murrays' reliance on *Pryor's* reasoning in this case is misplaced. The "critical fact" in *Pryor* was that the third-party offeror "extended the proration period after the offer had been oversubscribed ... *and after the proration deadline had passed." Id.* (emphasis added). By including shares that were not timely filed in the *pro rata* pool, the third-party offeror contravened section

**15.** Section 14(d)(6) requires that partial third-party tender offers be subject to a mandatory minimum proration period of ten days. 15 U.S.C. § 78n(d)(6). Although section 14(d)(6) and Rule 13e–4(f)(3) are not identical, they are based on the same underlying policy concerns. *See* Exchange Act Release No. 10,842 [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,182.

14(d)(6)'s intended purpose—to spread any control premium among those shareholders who tender *within the proration period.* In the present case, it is undisputed that HCA did not permit any shareholders to tender shares after the Tender Offer's proration/expiration date expired on January 4, 1988. Although HCA did reduce the proration factor indirectly by twice extending its offer when the offer was already oversubscribed, it did not violate section 13(e)(1) or Rule 13e–4(f)(3) by doing so. The Murrays knew or at least should have known that such extensions were possible. Furthermore, the Murrays were entitled to withdraw their tendered shares at any time prior to January 4, 1988. *See* 17 C.F.R. § 240.13e–4(f)(2)(i). Instead of withdrawing their shares, however, the Murrays participated in the Tender Offer and shared in the approximately $14 per share control premium paid by HCA. For these reasons, defendants' motion for summary judgment on the Murrays' section 13(e)(1)/Rule 13e–4(f)(3) claim is granted.[16]

### III. *Conclusion*

For the reasons set forth above, the Court dismisses plaintiffs' Second Amended Complaint for failure to state a claim upon which relief can be granted. In addition, the Court grants defendants' motion for summary judgment on the Murrays' supplemental complaint and dismisses the supplemental complaint with prejudice.

---

**16.** Because the Court grants defendants' motion for summary judgment on the sole federal claim alleged in the Murrays' supplemental complaint, the Court dismisses the remaining pendent state-law claims alleged in the supplemental complaint for lack of subject-matter jurisdiction. *See supra* note 6.